The REPUBLIC OF the PHILIPPINES,
Plaintiff-Appellee,

v.

Ferdinand E. MARCOS, Imelda Marcos, Ralph Bernstein, Joseph Bernstein, Gliceria Tantoco, Vilma Bautista, Antonio Floirendo, Paul A. Crotty, as Commissioner of Finance of the City of New York, Department of Finance of the City of New York, City Register's Office of the City of New York, John Kinsella, County Clerk, Suffolk County, New York Land Company, a/k/a Greatneckers Realty, Inc., Canadian Land Company of America, a/k/a Canadian Land Company of America, N.V. (formerly Lastura Corporation, N.V.), Lastura Corporation, N.V., Herald Center, Ltd. (formerly Volby, Ltd.), Volby, Ltd., Glockhurst Corp., N.V., Realmad Properties Ltd., Briwater Associates, a partnership, Nyland (CF8) Ltd. (formerly Ainsville, N.V.), Ainsville, N.V., and Ancor Holdings, N.V., Defendants,

New York Land Company, Joseph Bernstein, Ralph Bernstein, the Canadian Land Company of America, Herald Center Ltd., and Nyland (CF8) Ltd., and Ancor Holdings, N.V., and Glockhurst Corp., N.V., Defendants-Appellants.

Nos. 1455, 1456, 1457, Dockets 86–7350, 86–7356, 86–7362.

United States Court of Appeals,
Second Circuit.

Argued June 11, 1986.

Decided Nov. 26, 1986.

Michael J. Silverberg, New York City (Phillips, Nizer, Benjamin, Krim & Ballon, Lawrence M. Sands, New York City, of counsel), for defendants-appellants New York Land Co., Joseph Bernstein and Ralph Bernstein.

Philip R. Carter, New York City (Bernstein, Carter & Deyo, Tina Schechter, New York City, of counsel), for defendants-appellants The Canadian Land Co. of America, Herald Center Ltd., and Nyland (CF8) Ltd.

Gerald Walpin, New York City (Rosenman Colin Freund Lewis & Cohen, Lawrence G. Golde, Steven Dixon, Donna Soares, New York City, of counsel), for defendant-appellant Ancor Holdings, N.V.

David J. Eiseman, New York City (Golenbock, Eiseman, Assor, Bell & Perlmutter, Jeffrey T. Golenbock, New York City, of counsel), for defendant-appellant Glockhurst Corp., N.V.

Morton Stavis, Peter Weiss, New York City (Center for Constitutional Rights, Franklin Siegel, Juan Saavedra-Castro, New York City, of counsel); (Severina Rivera, Mahlon F. Perkins, Jr., Ralph Shapiro, Michael Krinsky, Washington, D.C., on the brief); (Sills, Beck, Cummis, Zuckerman, Radin, Tischman & Epstein, P.A., Clive S. Cummis, Jeffrey J. Greenbaum, Washington, D.C., of counsel), for plaintiff-appellee The Republic of the Philippines.

Before OAKES, ALTIMARI, and MAHONEY, Circuit Judges.

OAKES, Circuit Judge:

This appeal is from a grant of a preliminary injunction in favor of The Republic of the Philippines ("The Republic") by the United States District Court for the Southern District of New York, Pierre N. Leval, Judge. The injunction continued an expiring temporary restraining order conditioned on the posting of a bond of $3 million against the transfer or encumbrance of five pieces of real property (the "properties"), four of which are located in New York City and one of which is in Long Island, New York. Judge Leval found that The Republic of the Philippines had met the standard under *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979) (per curiam), for issuing a preliminary injunction by "amply show[ing] 'sufficiently serious questions going to the merits to make them a fair ground for litigation' together with irreparable harm and a balance of hardships tipping in [the Republic's] favor." Order of May 2, 1986, as amended May 5, 1986 (quoting *Jackson Dairy*, 596 F.2d at 72). 634 F.Supp. 279.

At the heart of this case is the issue of who owns the five properties,[1] which consist of the following:

1. 40 Wall Street, a 71–story office building owned by Nyland (CF8) Ltd., a Netherlands Antilles corporation which in turn is owned by three Panamanian corporations that issued "bearer" shares to unknown persons.

2. The Crown Building, previously the Genesco Building, at 57th Street and Fifth Avenue, owned by The Canadian Land Company of America, formerly a Netherlands Antilles corporation called Lastura Corporation, which in turn is owned by three other Panamanian corporations that also issued "bearer" shares.

3. Herald Center, previously the Korvette Building, at Sixth Avenue and 34th Street, which is owned by Herald Center Ltd., formerly Voloby Ltd., a British Virgin Islands corporation. Herald Center Ltd. is owned by three other Panamanian corporations, again issuers of "bearer" shares.

   (These three properties have been managed by the appellants Joseph and Ralph Bernstein, and will sometimes be referred to as the Bernstein properties.)

4. 200 Madison Avenue, at the southwest corner of 36th Street and Madison Avenue, which is owned by Glockhurst Corp., N.V., which in turn is owned by the same three Panamanian corporations that own Herald Center Ltd.

5. Lindenmere, an estate in Suffolk County, Long Island, in the town of Brookhaven, Center Moriches, Long Island. Lindenmere was originally purchased by Luna 7 Corporation, which was owned by several Filipinos, and was later conveyed to Ancor Holdings, N.V., a Netherlands Antilles corporation. Beneficial ownership is claimed by defendant Antonio Floirendo, a Philippine businessman and close associate of the Marcoses.

The appellants are the corporations holding title to the properties, together with Joseph Bernstein and Ralph Bernstein (the "Bernsteins"), whose law firm represents three of the corporate appellants, and New York Land Company, which is owned by the Bernsteins and which manages three of the properties. Other defendants named in this suit include Ferdinand E. Marcos and Imelda Marcos, the former President and First Lady of the Philippines who purportedly are the beneficial owners of the properties, and their alleged associates Gliceria Tantoco, Vilma Bautista, and Antonio Floirendo, although these individuals are not involved in this appeal and did not appear in the proceedings below.

The original complaint in this action, dated March 2, 1986, was filed in the Supreme Court of the State of New York, County of New York, prior to its removal to the United States District Court for the Southern District of New York. After the complaint was filed, but prior to removal of the case to federal court, President Corazon C. Aquino signed Executive Order Number 2, which, among other things, authorized the Commission on Good Government[2] to appeal to foreign countries to freeze the assets of the Marcoses and their associates. This order, as discussed later, contributed heavily to interjecting a federal issue into the case sufficient to confer federal question subject matter jurisdiction.

---

1. This issue was the subject of detailed sworn testimony in early 1986 before the Asian and Pacific Affairs Subcommittee (the Solarz Committee) of the House Committee on Foreign Affairs.

2. The Commission on Good Government was created under Executive Order No. 1, dated February 28, 1986. One of its purposes is

   [t]he recovery of all ill-gotten wealth accumulated by former President Ferdinand E. Marcos, his immediate family, relatives, subordinates and close associates, whether located in the Philippines or abroad, including the takeover or sequestration of all business enterprises and entities owned or controlled by them, during his administration, directly or through nominees, by taking undue advantage of their public office and/or using their powers, authority, influence, connections or relationship.

In a section entitled "Background," the complaint outlines the well-publicized circumstances leading up to the recent upheaval in the Philippines. It first states that Ferdinand Marcos became president of the Philippines in 1966. On September 21, 1972, he declared martial law, thus allegedly becoming the dictator of the Philippines with personal control over its government and economy. During the entire period of his rule, and particularly after the imposition of martial law, Marcos allegedly participated in a variety of activities constituting a gross denial of human rights, including abduction, murder, torture, summary incarceration and execution, and control of the media. In addition, he is also alleged to have engaged in widespread and systematic theft of funds and properties that were and are the property of the Philippine government and people. The complaint charges that Marcos accomplished this by using techniques such as (1) accepting payments, bribes, kickbacks, interests in business ventures, and other things of value in exchange for the grant of government favors, contracts, licenses, franchises, loans and other public benefits; (2) blatantly expropriating private property for the benefit of persons beholden to or fronting for Marcos, with this expropriation at times carried out by violence or the threat of violence or incarceration; (3) arranging loans by the Philippine government to private parties who were Marcos's cronies or friends; (4) directly raiding the public treasury; (5) diverting loans, credits, and advances from other governments intended for use by the Philippine government; and (6) creating public monopolies which were placed in the hands of Marcos's loyalists or nominees. These actions of Marcos, together with similar acts by his wife, are said not only to be in violation of the laws of the Philippines but also to have caused a massive drain upon the funds of the Philippine government.

Returning to the specific facts of this case, the complaint alleges that Ferdinand Marcos now resides in Hawaii with his wife, Imelda, after fleeing the Philippines and surrendering his position on February 25, 1986. The Marcoses allegedly do business in New York and use agents, representatives, and nominees in New York and elsewhere to assist in the operation of the properties. Specifically, the complaint charges that there was a conspiracy among Ferdinand and Imelda Marcos; Ralph and Joseph Bernstein; Gliceria Tantoco, a close friend and business associate of the Marcoses who until February 1985 dealt with the Bernsteins in New York; Vilma Bautista, who worked in the Philippine consulate in New York and the Philippine Mission to the United Nations and acted as personal secretary to Imelda Marcos in New York; Antonio Floirendo, a Philippine plantation owner and businessman who made a $600,000 payment as a deposit on Herald Center and claims to be the owner of Ancor Holdings; and numerous other persons, including Fe Giminez, personal secretary and confidante of Imelda Marcos. By virtue of the alleged conspiracy, assets and properties acquired by or for the benefit of the Marcoses were placed in the names of nominees. In this way the five properties in New York were allegedly purchased for the benefit of the Marcoses from the proceeds of moneys and assets stolen as stated above from the Philippine government.

The complaint goes on to allege that on or about February 26, 1986, the current Philippine government created the Presidential Commission for Good Government, under the chairmanship of former Senator Jovito Salonga. This commission has been specifically directed to investigate and cause to be adjudicated in the Philippines any meritorious claims that specific properties or assets are the product of theft from the government and also to take steps to retrieve any government property taken by the Marcoses. The complaint states that the judicial system of the Philippines is patterned after that of the United States and that under the present government the system provides or will provide all elements of due process of law.

Finally, the complaint alleges that there have been clear indications that Marcos or his nominees are seeking to liquidate or

transfer some assets, including the New York properties involved here. Unless the relief sought is granted, the complaint continues, the properties now held by or for the benefit of the Marcoses may be further transferred and dissipated, possibly to purchasers in good faith. Thus, the complaint asks that the court enjoin and restrain the defendants from transferring, conveying, encumbering, or in any way adversely affecting the rights of the government of the Philippines in and to the properties pending determination as to the true ownership of and entitlement to the parcels of land.

The district court granted this relief and issued a preliminary injunction on May 2, 1986. Since this grant, The Republic has augmented its considerable preinjunction discovery—obtained despite the defendants' lack of cooperation—with additional materials. Accordingly, it has submitted a supplemental appendix that includes material not before the district court at the time its injunction was granted, all subject to the objection of the appellants. Because we could hold the appeal pursuant to 28 U.S.C. § 2106 (1982) pending further findings and conclusions by the district court were we to conclude that subject matter jurisdiction was questionable, *see IIT v. Vencap, Ltd.,* 519 F.2d 1001, 1018–19 (2d Cir.1975), we will in a few instances refer to matter in the supplemental appendix but will do so provisionally and specifically.

The evidence of the Marcoses' ownership of the New York properties is complex and circumstantial. Most of it relates to the Bernstein properties: 40 Wall Street, the Crown Building, and Herald Center. Joseph Bernstein, both in deposition and in testimony before the Solarz House Subcommittee, repeatedly stated that he believed but did not know with certainty that Imelda Marcos owned the properties. That belief was based in large part on her behavior and comments during a series of meetings. For example, at a 1981 meeting at the Waldorf-Astoria with Mrs. Marcos and Gliceria Tantoco, Bernstein got the impression that they wanted to buy Herald Center, then known as the Korvette Building, to make it a Philippine commercial center.

He testified that Mrs. Marcos said to Mrs. Tantoco, "Glissy, you put your stores there and make it expand our exports of Philippine goods." Over the years Bernstein "personally came to the impression that Mrs. Marcos had certain controls that [he] from time to time viewed as indicative of ownership, but [he didn't] actually know as a matter of fact who owns [Herald Center]." Bernstein considered two 1984 meetings at 15 East 66th Street, a townhouse owned by the Philippine government, not here involved, probably the strongest indicators of Mrs. Marcos's involvement. At those meetings Bernstein and Mrs. Tantoco were trying to get money out of Mrs. Marcos; they needed at the time about $10 million to develop the 40 Wall Street property, and the Bernsteins had recommended to Mrs. Tantoco that it be sold. At the first meeting, Mrs. Marcos refused to contribute, saying "there is no money" and "paddle your own canoe," but at the same time stated that the building "wouldn't be sold." At the second meeting, she turned to Rolando Gapud, president of Security Bank & Trust Company of Manila and the Marcoses' financial adviser, to ask, "Do we have $10 million?" This gave Bernstein "the impression that if she had $10 million for it she must have some interest" in the building. On another occasion the Bernsteins, Mrs. Marcos, and Mrs. Tantoco were at the 66th Street townhouse in the evening and Mrs. Tantoco urged that they take a trip downtown; they drove to 40 Wall Street where Mrs. Tantoco and Mrs. Marcos got out of the car and looked at the building for a few minutes. When they returned to the car Mrs. Marcos remarked that it was a "nice" building, appearing to be proud of it.

As to Bernstein's connections with Ferdinand Marcos, Bernstein stated that in March 1982 he and Marcos met at a resort just south of Manila. On a veranda overlooking the Pacific they discussed the international tax aspects of the structure of a loan by a major French bank in the amount of some $34 million to Lastura, a Netherlands Antilles corporation that had ac-

quired the building at 730 Fifth Avenue, later known as the Crown Building. Marcos, who seemed quite knowledgeable, wanted to make sure that the loan was structured to minimize interest costs by avoiding United States withholding taxes. Bernstein subsequently met Marcos in a meeting in Marcos's private quarters, the family area at Malacanang Palace, where Mrs. Marcos, Mrs. Tantoco, Ralph Bernstein, and Rolando Gapud were present. The main purpose of the meeting was to discuss a trust agreement that Marcos directed Bernstein to draft. Bernstein did so and delivered the draft to Mrs. Tantoco in New York. On a third occasion, when Bernstein was leaving the Philippines on a plane with Mrs. Marcos in April 1982, Marcos came to say good-bye and reminded Bernstein about the trust agreement.

Perhaps as significant pieces of evidence as any, however, were two documents discovered in Manila in Malacanang Palace after the departure of the Marcoses. These documents, which Bernstein authenticated before the Solarz Committee, were declarations of trust executed by Bernstein on April 4 and April 5, 1982, at the direction of Gapud. The April 4 declaration set Bernstein up as a trustee for the benefit of President Ferdinand E. Marcos with respect to all matters relating to Lastura Corporation; the April 5 declaration deleted Marcos's name and inserted Beneficio Investment, Inc., a Panamanian corporation.

Bernstein stated that there did not seem to be any distinction as to ownership between any of the four Manhattan properties. He thought the use of off-shore corporations and bearer shares routine, for tax purposes; he initially had a power of attorney to act on behalf of the three Panamanian corporations that owned Voloby and for a while held their shares of stock. Gapud, according to Bernstein, represented "the principals," though no one ever mentioned names; Bernstein's impression was that he represented the Marcos family. Moreover, early on, when Mrs. Tantoco first took Bernstein to meet with Mrs. Marcos she referred to her as the "principal."

Bernstein also met in Geneva in March 1985 with Ron Zamora, a counsel to President Marcos, who told him that "the principal" had decided to sell the four Manhattan properties. Bernstein sought to have the first chance to buy them since the Bernsteins had been involved with the properties for such a long time.

In addition to Bernstein's testimony, Victor Politas, former vice president of New York Land Company, testified before the Solarz Committee that both Bernstein and Mrs. Tantoco told him that the four New York properties were owned by Mrs. Marcos. Several documents allegedly found in Malacanang Palace after the Marcoses left the Philippines also indicate that the Marcoses had an interest in the four New York properties. One document, dated August 9, 1983, is from Mrs. Tantoco to "the Beneficial Owners of Canadian, Voloby, Nyland, and Glockhurst." This memorandum discusses both the feasibility of raising $16.8 million through a third mortgage on 40 Wall Street and the cash flow for the three Bernstein properties before and after the planned acquisition of 200 Madison Avenue. Another document, also found at the Palace, is entitled "New York Real Estate Accounts Summary Report" and describes in detail the equity investment in the three Bernstein properties as well as the financial condition of Voloby, Nyland, and Canadian Land Company, titleholders of Herald Center, 40 Wall Street, and the Crown Building, respectively. Other documentation appearing in the supplemental appendix also implicates the Marcoses.

Overall, the evidence of ownership of the Bernstein properties is strong, if not overwhelming, no evidence has been offered to refute it, and the Bernstein brief on appeal fails to challenge the conclusion that the Marcoses are in fact the beneficial owners of the Manhattan properties.

Glockhurst Corp., N.V., is on slightly different footing. It argues that there is no competent evidence that the Marcoses beneficially owned Glockhurst or 200 Madison Avenue. Yet, their brief concedes that

Glockhurst is owned by the very same Panamanian corporations that own Herald Center Ltd. Thus, whoever owns Herald Center by way of the Panamanian corporations also owns Glockhurst. As noted above, the August 9, 1983, memorandum to the "Beneficial Owners of Canadian, Voloby, Nyland, and Glockhurst" indicates the cash flow from the three properties, the Crown Building, 40 Wall Street, and Herald Center, "before the acquisition of Madison ... [which is] to be achieved purely through borrowing (by Canadian and Glockhurst)," with subsequent cash flow after the acquisition of Madison also set forth. In addition, Joseph Bernstein testified that approximately $20 million of the proceeds of a mortgage taken on the Crown Building were transferred from Canadian Land to Glockhurst at the direction of Mrs. Tantoco for the purpose of buying 200 Madison Avenue. He also testified that Mrs. Tantoco indicated in a meeting at 66th Street by way of explanation to Mrs. Marcos that the four properties constituted "a balanced portfolio in the four corners of town." Before the Solarz Committee Bernstein testified that Mrs. Marcos would probably not have been at the so-called Barry Knox meetings in 1984 if she had not been an owner of 200 Madison Avenue. He also stated that 200 Madison Avenue was one of the four properties that Ron Zamora mentioned in Geneva in March 1985 as possibly being put up for sale by the "principal." We note that it also appears from the supplemental appendix (which would need appropriate authentication and introduction into evidence on any hearing on a final injunction) that apparently $4.3 million was paid to Glockhurst from trust accounts in Manila managed by Rolando Gapud. The records of this payment conform to a document in the handwriting of Imelda Marcos's personal secretary, Fe Gimenez, showing payments of $5.5 million to Tantoco, $9.5 million to Voloby, $6 million to Floirendo, and $4.3 million to "Blackhurst" on November 4, 1983, for a total of $25.3 million.

The evidence of the Marcoses' ownership of Lindenmere, the Center Moriches property, is somewhat less compelling. Mrs. Marcos attended several parties there involving thirty to fifty people. Documents indicating substantial payments to Lindenmere, including the monthly payment of bills, were found in Gimenez's files in the Palace. An architect, Augusto Comacho, testified that he worked on both Lindenmere and The Republic's townhouse at 15 East 66th Street. Bills covering that work are in the record to the tune of several million dollars. When Comacho was not paid for this work, he sought payment directly from Mrs. Marcos and from her New York secretary, Vilma Bautista. He ultimately brought suit and settled for $825,-000 after negotiating with Fe Gimenez. The $825,000 settlement was paid out of one of the trust accounts under Gapud's control to the law firm of Rosenman Colin Freund Lewis & Cohen, which then paid Comacho.

Title to Lindenmere is held by Ancor Holdings, N.V., a Netherlands Antilles corporation. Diosdado C. Ordonez, an employee of Revere Sugar Corporation and a long-term associate of Antonio Floirendo, testified that Floirendo owns Ancor Holdings. According to Ordonez, Floirendo also owns 100% of Revere Sugar, an outcome of the acquisition of the sweetener division of Sucrest Corp. Evidence in the supplemental appendix tends to show, however, that the Marcoses also had an interest in Revere Sugar, a fact that helps to identify the financial ties between the Marcoses and Floirendo. The clearest example of these ties is contained in Fe Gimenez's accounting (in the joint appendix), which shows payments of $9.5 million to Voloby and $4.3 million to "Blackhurst," matching payments from the Gapud trust accounts to be found in the supplemental appendix. This very same accounting notes a $6 million payment to Floirendo. Other evidence links Floirendo to various payments on the Manhattan properties.

■ Of course, as Judge Leval noted, when considering a preliminary injunction he need not make conclusive factual findings. Rather, he indicated that no proofs

had been submitted to rebut the inferences on which The Republic relies and concluded only that the standards for issuance of a preliminary injunction had been satisfied. We agree, and find that there is sufficient evidence as to all five properties to support the district court's grant of a preliminary injunction based on its findings of irreparable harm and probable ownership by the Marcoses.

Our task therefore is to determine whether there is federal jurisdiction, whether there are allegations sufficient to state a claim for relief, and whether there are, as the appellants argue, defenses making the claims not justiciable. These defenses include lack of standing on the part of The Republic, sovereign immunity, the act of state doctrine, and forum non conveniens, sovereign immunity.

### A. *Federal Jurisdiction*

■ All parties in this case now advocate a finding of federal jurisdiction. This is, of course, immaterial. Federal jurisdiction cannot be conferred by agreement of the parties and irrespective of such agreement a federal court has a duty on its own motion to consider whether there is properly federal jurisdiction in the case before it. *See, e.g., Louisville & Nashville Railroad Co. v. Mottley,* 211 U.S. 149, 152, 29 S.Ct. 42, 43, 53 L.Ed. 126 (1908). After the case was argued in our court, Judge Leval issued an opinion and order dated June 26, 1986, holding that there is federal jurisdiction in this case. Judge Leval thought the issue of jurisdiction not to be "open to serious doubt" because this is a case "arising under the Constitution, laws or treaties of the United States" and is therefore within federal question jurisdiction under 28 U.S.C. § 1331 (1982). We agree.

■ We recognize that the likelihood or inevitability that federal law matters will be raised in the answer or some subsequent pleading does not bring a case within federal question jurisdiction. *Mottley,* 211 U.S. at 152, 29 S.Ct. at 43. Rather, we are to examine the "well-pleaded complaint" to determine whether it relies on any doctrine

of federal law. *Franchise Tax Board v. Construction Laborers Vacation Trust,* 463 U.S. 1, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983), reaffirms that the lower federal courts have "jurisdiction to hear, originally or by removal from a state court, only those cases in which a well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." 463 U.S. at 27–28, 103 S.Ct. at 2856 (holding that a suit by a state tax authority both to enforce its levies against funds held in trust pursuant to an ERISA–covered employment benefit plan and to declare the validity of the levies notwithstanding ERISA is neither a creature of ERISA itself nor a suit of which the federal courts may take jurisdiction). Thus, we must analyze the plaintiff's complaint separate and apart from any defenses that the defendants have asserted or might assert in the future, to see if this action arises under federal law.

■ Such an examination shows that the plaintiff's claims necessarily require determinations that will directly and significantly affect American foreign relations. In *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 425, 84 S.Ct. 923, 938, 11 L.Ed.2d 804 (1964), the Supreme Court stated that issues involving "our relationships with other members of the international community must be treated exclusively as an aspect of federal law." While the issue in *Sabbatino* involved application of the act of state doctrine, in holding that the doctrine was to be applied as a matter of federal law the Court reasoned that foreign policy matters, entrusted by the Constitution primarily to the executive branch, have " 'constitutional' underpinnings," *id.* at 423, 84 S.Ct. at 938, and that the problems that arise when foreign policy matters come before the courts "are uniquely federal in nature," *id.* at 424, 84 S.Ct. at 938. As Judge Leval pointed out, two months after the *Sabbatino* decision the late Henry Friendly wrote that in the *Sabbatino* case "the Supreme Court has found in the Con-

stitution a mandate to fashion a federal law of foreign relations." Friendly, *In Praise of Erie and of the New Federal Common Law*, 39 N.Y.U.L.Rev. 383, 408 n. 119 (1964). The same judge wrote for this court in *Republic of Iraq v. First National City Bank*, 353 F.2d 47, 50 (2d Cir.1965), *cert. denied*, 382 U.S. 1027, 86 S.Ct. 648, 15 L.Ed.2d 540 (1966), that:

> The Supreme Court has declared that a question concerning the effect of an act of state "must be treated exclusively as an aspect of federal law." ... We deem that ruling to be applicable here even though, as we conclude below, this is not a case in which the courts of the forum are bound to respect the act of the foreign state.

The opinion in *Republic of Iraq* went on to say that the decision whether to enforce the act of a foreign sovereign affecting property in the United States "is closely tied to our foreign affairs, with consequent need for nationwide uniformity," *id.*, and that "when property confiscated is within the United States at the time of the attempted confiscation, our courts will give effect to acts of state 'only if they are consistent with the policy and law of the United States,'" *id.* at 51. *See also Allied Bank International v. Banco Credito Agricola*, 757 F.2d 516, 521 (2d Cir.), *cert. dismissed*, —— U.S. ——, 106 S.Ct. 30, 87 L.Ed.2d 706 (1985); *Restatement of Foreign Relations Law* § 469 comment b (Tent. Final Draft 1985); Henkin, *The Foreign Affairs Power of the Federal Courts: Sabbatino*, 64 Colum.L.Rev. 805, 815 (1964); Note, *The Federal Common Law*, 82 Harv. L.Rev. 1512, 1520–21 (1969). The principles stated in *Sabbatino* and *Republic of Iraq* extend beyond the act of state doctrine context in which both cases arose and support the existence of federal jurisdiction where the allegations in the complaint, as in this case, concern efforts by a foreign government to reach or obtain property located here.

Further support for holding that there is federal question jurisdiction over actions having important foreign policy implica-

tions is found in the very recent case of *Merrell Dow Pharmaceuticals Inc. v. Thompson*, —— U.S. ——, 106 S.Ct. 3229, 92 L.Ed.2d 650 (1986), in which the Court emphasized the flexible and pragmatic considerations involved in determining federal jurisdiction in "close" cases. *See id.* 106 S.Ct. at 3236 n. 12 (jurisdiction under section 1331 turns on the "nature of the federal issues at stake"); *see also Stone & Webster Engineering Corp. v. Ilsley*, 690 F.2d 323, 328 n. 4 (2d Cir.1982), *aff'd*, 463 U.S. 1220, 103 S.Ct. 3564, 77 L.Ed.2d 1405 (1983). As stated by Chief Judge Lumbard in *Ivy Broadcasting Co. v. American Telephone & Telegraph Co.*, 391 F.2d 486, 492 (2d Cir.1968):

> We believe that a cause of action ... "arises under" federal law if the dispositive issues stated in the complaint require the application of federal common law.... The word "laws" in § 1331 should be construed to include laws created by federal judicial decisions as well as by congressional legislation.

*See also Illinois v. City of Milwaukee*, 406 U.S. 91, 99–100, 92 S.Ct. 1385, 1390–91, 31 L.Ed.2d 712 (1972); 13B C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3563 at 60–61 (2d ed. 1984).

Weighing in favor of the application of federal common law here is the fact that prior to the filing of the complaint in the New York State Supreme Court, The Republic of the Philippines had already promulgated Executive Order No. 1 appointing the President's Commission on Good Government and charging it with the recovery of all ill-gotten wealth accumulated "by the former President." And, prior to the removal to federal court, Executive Order No. 2 had been promulgated freezing the assets of the Marcoses in the Philippines and appealing to foreign governments to freeze assets in their countries. Whether any confiscatory action by the Philippines will be entitled to credit in the United States courts is a question for another day, but it is surely a question that will be governed by federal law within the original jurisdiction of the court under section 1331 of the Judicial Code.

■ On the face of the complaint, to be sure, the plaintiff brought this case under a theory more nearly akin to a state cause of action for conversion, requiring the imposition of a constructive trust or equitable lien upon the "ill-gotten" gains, *see Restatement of Restitution* §§ 128 comment *l*, 161 (1937), rather than under stated federal common law. But a "well-pleaded" complaint can be read in one of two ways to implicate federal law. As was held in *Avco Corp. v. Aero Lodge No. 735*, 376 F.2d 337, 340 (6th Cir.1967), *aff'd*, 390 U.S. 557, 88 S.Ct. 1235, 20 L.Ed.2d 126 (1968), federal court jurisdiction may not be defeated simply by pleading a state cause of action when that cause of action had been preempted by federal law—in *Avco,* section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185 (1982). Discussing *Avco* in *Franchise Tax Board,* the Supreme Court said that *Avco* had held that federal jurisdiction exists even though the plaintiff pleads a state cause of action if federal law "is so powerful as to displace entirely any state cause of action." 463 U.S. at 23, 103 S.Ct. at 2853. Our question then would be whether the federal common law in the area of foreign affairs is so "powerful," or important, as to displace a purely state cause of action of constructive trust. We think it probably is: an action brought by a foreign government against its former head of state arises under federal common law because of the necessary implications of such an action for United States foreign relations. But even if we were wrong on this point, at the least this case presents "the presence of a federal issue in a state-created cause of action" within *Merrell Dow Pharmaceuticals, Inc. v. Thompson,* — U.S. —, 106 S.Ct. 3229, 3233, 92 L.Ed.2d 650 (1986). This is true because the action is brought by a foreign government against its former head of state to regain properly allegedly obtained as the result of acts while he was head of state.

■ We hold that federal jurisdiction is present in any event because the claim raises, as a necessary element, the question whether to honor the request of a foreign government that the American courts enforce the foreign government's directives to freeze property in the United States subject to future process in the foreign state. The question whether to honor such a request by a foreign government is itself a federal question to be decided with uniformity as a matter of federal law, and not separately in each state, *see Republic of Iraq, supra,* regardless of whether the overall claim is viewed as one of federal or state common law.

On this view, we need not determine whether there is federal jurisdiction under the Alien Tort Claims statute. We note simply that *Filartiga v. Pena-Irala,* 630 F.2d 876, 888–89 (2d Cir.1980), does hold that individual claims involving torture are justiciable under the statute. Though there are generalized allegations of torture in violation of the human rights of unnamed individuals in the present complaint, we do not read the complaint as seeking restitution to private individuals and appellee does not suggest otherwise. *See also Dreyfus v. Von Finck,* 534 F.2d 24, 30–31 (2d Cir.) (coerced transfer of Jewish German citizen's property by Nazis not a violation of international law triable in a United States court), *cert. denied,* 429 U.S. 835, 97 S.Ct. 102, 50 L.Ed.2d 101 (1976); *IIT v. Vencap, Ltd.,* 519 F.2d 1001, 1015 (2d Cir. 1975) (acts of theft not violations of international law and not triable here under Alien Tort Claims statute).

### B. *Statement of a Claim*

We have already indicated that The Republic has offered sufficient evidence to justify the issuance of a preliminary injunction, evidence of both the Marcoses' beneficial ownership of the properties involved and the irreparability of the harm that would result if no injunction freezing the assets pending final determination of their ownership were issued. Additionally, in seeking to state a claim for relief under the federal or state common law theory of constructive trust and equitable lien, The Republic has also presented evidence that the

funds used to acquire the properties were illegally obtained.

Bernstein testified that one night in a New York restaurant Mrs. Marcos started talking "in terms of what she owned in the world." After mentioning her Swiss bank account she pulled out a statement indicating that the account was worth in the nature of $120 million. Perhaps the strongest evidence in the record that the Marcoses' money was obtained illicitly is a memorandum dated March 25, 1983, for Ferdinand Marcos from the president of the Philippine National Bank (PNB), the official depository of The Republic of the Philippines. This document requests approval to charge temporarily against the Office of the President's accounts receivable several unliquidated advances from the bank's New York branch totaling over $9.8 million. The memorandum states that "[d]isposition of the receivable will subsequently be made from the Philippine Intelligence Fund to be provided out of PNB profits when the income or profit position of PNB can absorb it." Accompanying memoranda indicate the actual items whereby the $9.8 million of expenditures was accumulated, many items representing deposits to the accounts of Fe Gimenez or Vilma Bautista in the hundreds of thousands of dollars. The memoranda also indicate a $300,000 payment to Voloby, payments to Mrs. Tantoco, and, separately, a $500,000 check from PNB to Antonio Floirendo dated July 23, 1982. The supplemental appendix contains an affidavit by Fernando Flores, Senior Assistant Manager of the Cash Department at the Manila office of Security Bank & Trust Company. Flores states that starting in 1982 he received instructions from Rolando Gapud, president of the bank, as to certain trust accounts. Large boxes of cash were brought to Flores by Gapud to be turned over to the Cash Department for counting and then deposited into the accounts designated by Gapud. From January 11, 1985, to August 13, 1985, deposits totaling over $20 million were made to just one of these accounts and in 1984–85 numerous payments were made from another to Vilma Bautista, Rosenman Colin Freund, and other accounts in New York.

■ We think The Republic has presented enough evidence of illegality to warrant a preliminary injunction based on a claim for imposition of a constructive trust or an equitable lien. As Judge Cardozo put it when he was on the New York Court of Appeals, "A constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee." *Beatty v. Guggenheim Exploration Co.*, 225 N.Y. 380, 386, 122 N.E. 378, 380 (1919). The court " 'reserves freedom to apply this remedy to whatever knavery human ingenuity can invent.' " *Simonds v. Simonds*, 45 N.Y.2d 233, 241, 380 N.E.2d 189, 194, 408 N.Y.S.2d 359, 363 (1978) (quoting Bogert, *Trusts and Trustees* § 471 at 29 (2d ed. rev. 1978)). And, " '[a] constructive trust will be erected wherever necessary to satisfy the demands of justice.... [I]ts application is limited only by the inventiveness of men who find new ways to enrich themselves unjustly by grasping what should not belong to them.' " *Id.* at 241, 380 N.E.2d at 194, 408 N.Y.S.2d at 363 (quoting *Latham v. Father Divine*, 299 N.Y. 22, 27, 85 N.E.2d 168, 170 (1949)). *See also Restatement of Restitution* § 160 comment a (1937) (constructive trust is simply a remedy to prevent unjust enrichment and may or may not involve a fiduciary relationship); *id.* § 160 comment g (stating that where property is held by one person upon a constructive trust for another and the former transfers the property to a third person who is not a bona fide purchaser, the interest of the beneficiary is not cut off); *id.* § 168 (same). Moreover, the *Restatement of Restitution* makes it evident that the doctrine of equitable liens may be operative here, perhaps requiring a less specific tracing of the proceeds than in the case of a constructive trust. *See id.* §§ 128 comment *l*, 161.

If the overall claim is one based on state law, it is clearly sufficient under the New York law stated above. Even if the claim is one under federal common law, it would still be sufficient if state law is adopted as the federal common law, as is appropriate in cases such as this where adoption of state law does not conflict with federal policy. *See United States v. Crain*, 589 F.2d 996, 999 (9th Cir.1979). Moreover, the sufficiency of the claim as a matter of federal common law is shown by analogy to federal cases involving the duties of federal employees to the United States. For example, *United States v. Carter*, 217 U.S. 286, 306, 30 S.Ct. 515, 520, 54 L.Ed. 769 (1910), demonstrates that the law of constructive trusts (and equitable liens) finds a basis in federal common law. There the Court stated, "The larger interests of public justice will not tolerate, under any circumstances, that a public official shall retain any profit or advantage which he may realize through the acquirement of an interest in conflict with his fidelity as an agent [of the United States]." Our own case, *United States v. Podell*, 572 F.2d 31, 35 (2d Cir.1978), holds likewise, and as a matter of federal common law imposed a constructive trust on moneys received by a United States congressman who violated both his fiduciary duty and a conflict of interest statute by appearing before federal agencies on behalf of a private client.

The appellants have argued that under New York Civ.Prac.R. § 6201 (McKinney 1980) a party who does not seek a money judgment is not entitled to prejudgment attachment and therefore cannot obtain a preliminary injunction. Of course a party is not entitled preliminarily to enjoin the transfer of property that will be irrelevant to a final judgment. *De Beers Consolidated Mines, Ltd. v. United States*, 325 U.S. 212, 220, 65 S.Ct. 1130, 1134, 89 L.Ed. 1566 (1945). However, preliminary injunctions are proper to prevent a defendant from making a judgment uncollectible, *In re Feit & Drexler, Inc.*, 760 F.2d 406, 416 (2d Cir.1985); *see also International Controls v. Vesco*, 490 F.2d 1334, 1347 (2d Cir.), *cert. denied*, 417 U.S. 932, 94 S.Ct. 2644, 41

L.Ed.2d 236 (1974), and "[a] preliminary injunction is always appropriate to grant intermediate relief of the same character as that which may be granted finally." *De Beers Consolidated Mines*, 325 U.S. at 220, 65 S.Ct. at 1134. Here, the preliminary relief sought by The Republic is intended to prevent any transfer or encumbrance of the properties that would place them beyond The Republic's reach or would prevent reconveyance of the properties to The Republic. There thus appears to be no bar to the grant of a preliminary injunction and the district court may either itself determine ownership or defer to Philippine proceedings, assuming they proceed with sufficient dispatch to avoid raising problems of due process as to the property here.

### C. *Standing and Justiciability*

Glockhurst and Ancor, in reliance on *Coleman v. Miller*, 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939), and *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), claim that this case is not justiciable because its determination involves unmanageable standards and because it potentially could cause embarrassment to the executive in its conduct of foreign affairs. But we agree with The Republic that there is nothing more unmanageable about this case than about any other case involving theft, misappropriation, corporate veils, and constructive trusts. The United States has made it clear that it does not fear embarrassment if the courts of this country were to take jurisdiction of this and other disputes between The Republic and ex-President Marcos. On the contrary, by letter and motion granted in open court for leave to file a statement of interest, all pursuant to *Allied Bank International v. Banco Credito Agricola, supra*, the Department of Justice, with the concurrence of the Office of the Legal Adviser to the Department of State has argued that with respect to the act of state doctrine the burden is on the party asserting the applicability of the doctrine, that defendants have to date not discharged their burden of proving acts of

state, and that, as to the allegations of head of state immunity, the defendants do not have standing to invoke the doctrine. By implication this position carries with it the proposition that the United States does not consider this suit to be an improper intrusion on its management of foreign affairs.[3]

The New York Land Company and the Bernsteins' brief questions the standing of The Republic of the Philippines to sue for alleged injuries to private citizens, but The Republic's brief points out that restitution to private individuals "is no part of this suit" and we take that at its face value.

### D. *The Act of State Doctrine*

Appellants strongly assert that the act of state doctrine prohibits adjudication in our court of the legality of the acts of a foreign head of state within his own country. We are cited to *Underhill v. Hernandez*, 65 Fed. 577 (CCA 1895), *aff'd*, 168 U.S. 250, 18 S.Ct. 83, 42 L.Ed. 456 (1897), and to *Hatch v. Baez*, 7 Hun. 596 (N.Y.Sup.Ct.1876). In *Underhill* this court refused to permit a suit for false imprisonment and assault and battery against a former "civil and military chief" of the city of Bolivar, Venezuela. The Supreme Court, affirming, held that

every sovereign state is bound to respect the independence of every other sovereign state. 168 U.S. at 252, 18 S.Ct. at 84. In *Hatch* the New York Supreme Court held that an action could not be maintained in New York against the former president of the Dominican Republic for acts done in his official capacity even though he had ceased to be president when the suit was brought. *See also Banco Nacional de Cuba v. Sabbatino*, 376 U.S. at 436–37, 84 S.Ct. at 944–45 (United States court may not examine the alleged illegality of an uncompensated taking of property within Cuba by the government of Cuba from a Cuban corporation), and *Oetjen v. Central Leather Co.*, 246 U.S. 297, 303–04, 38 S.Ct. 309, 311, 62 L.Ed. 726 (1918) (suit to regain property alleged to have been illegally seized by a foreign government within its own territory dismissed though within the jurisdiction of the United States court), both reaffirmed in *First National City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 92 S.Ct. 1808, 32 L.Ed.2d 466 (1972) (plurality opinion); *Bernstein v. Van Heyghen Freres, S.A.*, 163 F.2d 246, 249 (2d Cir.) (court will not pass on validity under law of foreign state of acts of officials of that state purporting to act as such), *cert. denied*, 332 U.S. 772, 68 S.Ct.

---

**3.** This conclusion is reinforced by a declaration of Michael H. Armacost, Undersecretary of State for Political Affairs, made on March 15, 1986, submitted to the United States Court of International Trade in connection with a pending suit before that court, and in our record. Undersecretary Armacost pointed out that the United States' relations with the Philippines are extremely important and that it is the policy of the United States to strengthen and broaden those relations, especially in light of the two countries' shared basic values such as a commitment to democratic government and respect for human rights. The Armacost declaration also points out that the United States has two of its largest overseas military facilities located in the Philippines, facilities of critical importance to the security of both nations, that the two countries have numerous defense agreements, and that the United States has provided the Philippines with over $250 million in military assistance in the past five years and permits Philippine nationals to enlist in the United States Navy.

The statement also emphasizes the important United States-Philippine economic relationship

involving in 1985 alone over $3.7 billion worth of bilateral trade, a direct United States investment in the Philippines of over $1.2 billion, and United States monetary aid to the Philippines totaling $226 million. The statement also notes United States-Philippine cooperation in numerous areas including agriculture, education, nuclear energy, and science, and mentions that the United States government recognized the new Philippine government headed by Corazon Aquino and "welcomed its commitment to fulfill the democratic aspirations of the Filipino people." The declaration refers to the establishment of the official Presidential Commission on Good Government headed by former Philippine Senator Jovito Salonga and to the United States' agreement to receive Senator Salonga at a diplomatic level. Undersecretary Armacost asserted that the Aquino government will view the United States' actions on this matter as an important indicator of the future course of our bilateral relations and stated that it is in the foreign policy interests of the United States to honor the Philippine government's requests at the earliest possible time.

88, 92 L.Ed. 357 (1947); *Banco de Espana v. Federal Reserve Bank of New York,* 114 F.2d 438 (2d Cir.1940) (act of state doctrine barred suit against former officials of deposed Spanish government for having diverted silver by means of illegal secret decrees).

*Sabbatino* treats the act of state doctrine as resting fundamentally on separation of powers concerns. There the court decided

> only that the Judicial Branch will not examine the validity of a taking of property within its own territory by a foreign sovereign government, extant and recognized by this country at the time of suit, in the absence of a treaty or other unambiguous agreement regarding controlling legal principles, even if the complaint alleges that the taking violates customary international law.

376 U.S. at 428, 84 S.Ct. at 940. While the position taken by the Executive is a relevant factor, it is not dispositive. *First National City Bank v. Banco Nacional de Cuba,* 406 U.S. at 773 & n. 4, 92 S.Ct. at 1816 & n. 4 (Douglas, J., concurring in result); *id.* at 775–76, 92 S.Ct. at 1817 (Powell, J., concurring in judgment); *Banco Nacional de Cuba v. Chase Manhattan Bank,* 658 F.2d 875, 884 (2d Cir.1981). "Whether to invoke the act of state doctrine is ultimately and always a judicial question." *Allied Bank International v. Banco Credito Agricola de Cartago,* 757 F.2d 516, 521 n. 2 (2d Cir.), *cert. dismissed,* —— U.S. ——, 106 S.Ct. 30, 87 L.Ed.2d 706 (1985).

*Restatement (Second) of Foreign Relations Law* § 41 (1965) provides further definition of the doctrine: United States courts "will refrain from examining the validity of an act of a foreign *state* by which that state has exercised its jurisdiction to give effect to its *public* interests" (emphasis added). *See also id.* § 41 comment d at 127; *Restatement (Revised) of Foreign Relations Law* § 428 (Tent. Draft No. 4, 1983) (no review of acts of a "foreign state taken in its sovereign capacity"); *id.* § 469 (Tent. Draft No. 7, 1986) (no

review of "acts of a governmental character"). That the acts must be *public* acts of the *sovereign* has been repeatedly affirmed. *See Alfred Dunhill of London, Inc. v. Republic of Cuba,* 425 U.S. 682, 694 & n. 10, 96 S.Ct. 1854, 1861 & n. 10, 48 L.Ed.2d 301 (1976) (noting that in *Ricaud v. American Metal Co.,* 246 U.S. 304, 38 S.Ct. 312, 62 L.Ed. 733 (1918), *Oetjen, supra,* and *Underhill, supra,* the conduct "was the *public act* of those with authority to exercise sovereign powers" (emphasis added)); *Dunhill,* 425 U.S. at 720, 96 S.Ct. at 1873 (Marshall, J., dissenting) (defining an act of state more broadly than the majority, but limiting it to a "foreign state ... exercis[ing] a sovereign power either to act or to refrain from acting"); *Sabbatino,* 376 U.S. at 401, 84 S.Ct. at 926 (the doctrine precludes inquiry into validity of "public acts" of foreign sovereign within its own territory); *Filartiga v. Pena-Irala,* 630 F.2d at 889 (doubting whether action by a state official, in violation of the constitution and laws of Paraguay, unratified by the government, could be characterized as an act of state); *Hunt v. Mobil Oil Corp.,* 550 F.2d 68, 73 (2d Cir.) (underscoring that acts must be "public" and "governmental" for the doctrine to apply), *cert. denied,* 434 U.S. 984, 98 S.Ct. 608, 54 L.Ed.2d 477 (1977); *Jimenez v. Aristeguieta,* 311 F.2d 547, 557–58 (5th Cir.1962) (doctrine applies only when an official having sovereign authority acts in an official capacity; a dictator is not the sovereign and his financial crimes committed in violation of his position and not in pursuance of it are not acts of a sovereign, but rather were for his own benefit and "as far from being an act of state as rape"), *cert. denied,* 373 U.S. 914, 83 S.Ct. 1302, 10 L.Ed.2d 415 (1963); *see also Arango v. Guzman Travel Advisors Corp.,* 621 F.2d 1371, 1380 (5th Cir.1980); *Sharon v. Time, Inc.,* 599 F.Supp. 538, 544 (S.D.N.Y.1984).

Cases relied on by appellants to the effect that acts that are illegal in the foreign state may still be protected from judicial scrutiny under the act of state doctrine are not to the contrary. In *Banco de Espana,* 114 F.2d at 444, this court held that if the

acts are those of a foreign sovereign—including acts of officials purportedly operating in their official capacity—then the act of state doctrine applies. *See also Bernstein,* 163 F.2d at 249; *French v. Banco Nacional de Cuba,* 23 N.Y.2d 46, 52, 242 N.E.2d 704, 709, 295 N.Y.S.2d 433, 440 (1968) (so long as the act is the act of the foreign sovereign, it matters not that the sovereign has transgressed its own laws).

■■■ Appellants simply fail to make the crucial distinction between acts of Marcos as head of state, which may be protected from judicial scrutiny even if illegal under Philippine law, and his purely private acts. Although the distinction between public and private acts of a foreign official may be difficult to determine, our courts have repeatedly done so. *See Dunhill,* 425 U.S. at 695, 96 S.Ct. at 1862 ("Distinguishing between the public and governmental acts of sovereign states on the one hand and their private and commercial acts on the other is not a novel approach."); *Texas Trading & Milling Corp. v. Federal Republic of Nigeria,* 647 F.2d 300, 308–09 (2d Cir.1981) (interpreting the commercial exception to the Foreign Sovereign Immunities Act), *cert. denied,* 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982). Since the burden of proof is on the party invoking the act of state defense, *Dunhill,* 425 U.S. at 694, 96 S.Ct. at 1861, appellants must ultimately demonstrate that the challenged acts of Marcos were in fact public acts (the allegations of the complaint covering both public and private acts). In addition, *Dunhill* appears to require a certain amount of formality to indicate that the act is in fact the act of the sovereign, although probably not the degree of formality suggested by former Judge Sofaer in *Sharon,* 599 F.Supp. at 544–45.

■■■ Two other considerations may limit the applicability of the doctrine even to Marcos's public acts. First, the Marcos government is no longer in power. Thus, the danger of interference with the Executive's conduct of foreign policy is surely much less than the typical case where the act of state is that of the current foreign government. Neither of the two cases in our circuit that have applied the doctrine to the acts of former governments, *Banco de Espana, supra,* and *Bernstein, supra,* discuss the separation of powers issue, and both cases appear more strongly to rely on the earlier sovereign immunity rationale. In *Sabbatino* the Court explicitly questioned this aspect of *Bernstein* in light of the doctrine's recast separation of powers rationale: "The balance of relevant considerations may also be shifted if the government which perpetrated the challenged act of state is no longer in existence, as in the *Bernstein* case, for the political interest of this country may, as a result, be measurably altered." 376 U.S. at 428, 84 S.Ct. at 940. Thus, before the doctrine is applied even to Marcos's public acts, the court must weigh in balance the foreign policy interests that favor or disfavor application of the act of state doctrine.

Moreover, the act of state doctrine reflects respect for foreign states, so that when a state comes into our courts and asks that our courts scrutinize its actions, the justification for application of the doctrine may well be significantly weaker. *Restatement (Revised) of Foreign Relations Law* § 469 comment e (Tent. Draft No. 7, 1986). We note, however, that the *Restatement* refers to acts of the current government, not the situation here.

In short, the district court will necessarily scrutinize the acts that The Republic challenges. Defendants must present evidence that these acts were public (e.g., that Marcos's wealth was obtained through official expropriation decrees or public monopolies). The court then must decide whether to examine these public acts in light of the considerations discussed above. If it chooses not to do so—and the determination whether the Marcoses obtained their wealth illegally, and hence the determination of ownership of the property at issue in this case, is impossible without such scrutiny—the court should consider deferring to a Philippine adjudication that comports with due process. But in any event, at this stage we agree with the position of

the United States quoted above that the defendants have not discharged their burden of proving an act of state. Only after that burden is met do other relevant factors need to be considered.

### E. *Acts of the Current Government*

Appellants' next claim is that The Republic's Executive Orders are confiscation decrees affecting property in the United States. In *Republic of Iraq, supra,* where the Republic of Iraq sought to confiscate a bank account and stock held in a custodian account in New York by the late King Faisal II, we ruled that the effect of a foreign act of state affecting property within the United States is a question of federal law and that a confiscation decree will be given consideration only if the decree is consistent with our policy and laws. 353 F.2d at 51. We then held that the decree in question was not consistent with our law. Citing *Banco de Vizcaya v. Don Alfonso de Borbon y Austria,* [1935] 1 K.B. 140, we held that confiscation of the assets of an individual is shocking to our sense of justice "even if he wears a crown," and pointed out that our Constitution sets itself against such confiscations not only by virtue of guarantees of due process and the Fifth and Fourteenth Amendments, but by specific prohibitions of bills of attainder in Article I. 353 F.2d at 51–52.

██ But, of course, the decrees in question in this case are not in and of themselves confiscation decrees. Here, no confiscation has occurred. In *Republic of Iraq,* the plaintiff argued that by virtue of its ordinance it had acquired title to the King's New York property when the ordinance was promulgated. 241 F.Supp. 567, 572 (S.D.N.Y.1965). Similarly, in *Bandes v. Harlow & Jones, Inc.,* 570 F.Supp. 955 (S.D.N.Y.1983), the district court considered that the Nicaraguan actions there involved had confiscated U.S.-located property. *Id.* at 960, 963. Here, by contrast, an examination of Executive Orders Nos. 1 and 2 shows that they do not purport to seize the United States properties of the Marcoses, nor does The Republic seek to enforce these orders as the basis for a recovery, even though they were accompanied by adequate evidence to warrant the issuance of a preliminary injunction against the transfer of the properties. The contention that a future adjudication in the Philippines will not comport with due process is not ripe. We have every reason to believe—at least we have no reason to suspect to the contrary—that any Philippine decree will comport with due process of law as the courts of the United States would envisage it. The complaint seeks recovery of property illegally taken by a former head of state, not confiscation of property legally owned by him.

### F. *Sovereign Immunity*

██ Appellants also claim that the Marcoses are entitled to sovereign immunity. We agree that appellants have no standing to assert this claim. But even if appellants had standing, we are not at all certain that the immunity of a foreign state, though it extends to its head of state, *Restatement (Second) of Foreign Relations Law* §§ 65, 66(b) (1965), goes so far as to render a former head of state immune as regards his private acts. *See The Schooner Exchange v. M'Faddon,* 11 U.S. (7 Cranch) 116, 145, 3 L.Ed. 287 (1812); Sucharitkul, *State Immunities and Trading Activities in International Law* 27–28, 32–34, 47–50 (1959). The rationale underlying sovereign immunity—avoiding embarrassment to our government and showing respect for a foreign state—may well be absent when the individual is no longer head of state and the current government is suing him. In any event, the Foreign Sovereign Immunity Act may not support appellants' immunity claim in light of its "commercial activity" exception, 28 U.S.C. § 1603(d), (e) (1982), and as we said above, these appellants lack standing to raise the immunity issue on the Marcoses' behalf, *Restatement (Second) of Foreign Relations Law* § 71 (1965).

We note *Nixon v. Fitzgerald,* 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982). There it was held that a former President of the United States enjoyed immunity from damages liability for acts within the outer perimeter of his official responsibili-

ty. *Id.* at 755–56, 102 S.Ct. at 2704. To the extent that it appears, as the proof develops, that this suit ultimately rests on official acts, the district court will of course be free to take that into account.

### G. *Forum Non Conveniens*

■ The district court, in refusing to dismiss on forum non conveniens grounds, noted that the plaintiff seeks to impress a constructive trust only in regard to property located in New York and seeks the appointment of a receiver pending final resolution of the case. At this stage, we note that forum non conveniens determinations are committed to the sound discretion of the trial court. *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 257, 102 S.Ct. 252, 266, 70 L.Ed.2d 419 (1981). True, *Islamic Republic of Iran v. Pahlavi*, 94 A.D.2d 374, 464 N.Y.S.2d 487 (1983), *aff'd*, 62 N.Y.2d 474, 467 N.E.2d 245, 478 N.Y.S.2d 597 (1984), held that Iran's in personam action against the former Shah and his wife alleging that they had accepted bribes, misappropriated funds, and embezzled or converted billions of dollars belonging to the national treasury of Iran should be dismissed because the litigation had little relation or connection to the state of New York other than the presence of the Shah and his wife in the state. There, the Appellate Division noted that it was *not* a dispute over the ownership of "specific property in this state." 94 A.D.2d at 377, 464 N.Y.S.2d at 490. Rather, the complaint there asked that a constructive trust be imposed "on assets of the defendants throughout the world." *Id.* at 377, 464 N.Y.S.2d at 490. Our case, however, involves a dispute as to the ownership of specific property in this state and only such property. Here the plaintiff seeks to impress a constructive trust only on assets in New York. The assets in dispute are pieces of real property, fixed and immovable. It thus seems difficult to deem the Southern District of New York an inconvenient forum. Nor is there any showing that an alternative forum is available and adequate to provide appropriate remedies in respect to this property, ultimate ownership of which rests with the holders of bearer shares of off-shore corporations. We put little or no stock in the suggestion made at oral argument that these shares could be located, attached, and the corporations themselves properly be brought before this or some other court.

Judge Leval rejected the forum non conveniens argument, noting that the complaint only seeks the United States' recognition of a Philippine decree and that the district court will not be asked to try the basic issues accusing President Marcos of unlawful takings. He did see that the court might be required to adjudicate whether Marcos is the owner of the New York properties, evidence as to which is in both New York and the Philippines, but he did not visualize that the case would involve questions of unlawful takings and the rights of the Philippine Republic. As for final relief, Judge Leval stated that evidence of wrongdoing would be reviewed only to the extent necessary to inquire whether the ultimate Philippine decree, if any, is consistent with the law and policy of the United States under *Republic of Iraq*. This action is merely ancillary to an eventual Philippine decree or judgment and was brought in the Southern District only because the real estate is located here.

Judgment affirmed.