Salvador BANDES, Plaintiff,

v.

HARLOW & JONES, INC., Defendants.

HARLOW & JONES, INC.,
Interpleader-Plaintiff,

v.

Salvador BANDES and David Alvarez,
Interpleader-Defendants.

No. 79 Civ. 5091(RO).

United States District Court,
S.D. New York.

July 18, 1983.

Reboul, MacMurray, Hewitt, Maynard & Kristol, New York City, for plaintiff and interpleader defendant Salvador Bandes; J. Joseph Bainton, Beckman Rich, New York City, of counsel.

Wachtell, Manheim & Grouf, New York City, for defendants and interpleader-plaintiff Harlow & Jones, Inc.; Harold Manheim, New York City, of counsel.

White & Case, New York City, for interpleader-defendant David Alvarez; Dwight A. Healy, New York City, of counsel.

## OPINION AND ORDER

OWEN, District Judge.

In 1979 during the final days of the Nicaraguan civil war, his factory a casualty of mortar fire, Salvador Bandes and his family fled to neighboring Honduras fearing for their safety because of his association with the tottering Somoza regime. At that time Bandes's company had paid an American firm, Harlow and Jones, Inc., the sum of $460,000 for steel billets which had not been, and because of events, never were delivered. Shortly thereafter, having prevailed in the war, the Sandinista revolutionary forces "intervened"—Bandes claims "confiscated"—Bandes's company. Today, representatives of the Sandinista government run his factory. The said $460,000, less some $40,000 of offsets, is the subject of this interpleader action.

In more detail the undisputed facts are as follows. Bandes's company, Industria Nacional de Clavos y Alambres de Puas, Sociedad Anonima ("INCA") is engaged in the business of manufacturing and selling steel products, such as nails, barbed wire, and steel construction rods. INCA markets its products within Central America. At full production, it employed approximately 350 workers and supplied in excess of 50% of the domestic Nicaraguan need for such commodities.

INCA's principal place of business is Masaya, Nicaragua, a city of some 35,000 people. It has been in business since 1960, initially having been formed as a partnership called Salvador Bandes & Co. In 1964, this partnership was reformed under its present name. In 1976, apparently as a condition of doing business in Nicaragua, INCA issued approximately 18% of its shares to General Jose Somoza, the brother of dictator General Anastasio Somoza. At the time of the events in issue, mid-1979, Salvador Bandes and the members of his family controlled approximately 75% of the stock, General Somoza owned 18% and some 6% was in the hands of others. Bandes was the president of its board of directors and its general manager, as well as being its majority stockholder.

In 1978, INCA ordered 2,000 metric tons of steel billets from H & J, a company located in Stamford, Connecticut. Subsequently, INCA and H & J agreed to reduce the size of that order to 2,000 tons of billets. In January and February, 1979, INCA paid H & J $460,000 for those billets in three installments. INCA has never taken delivery on the billets.

Thereafter, Bandes, acting pursuant to a long-held general power of attorney, commenced negotiations for the return of the money and, after the revolutionists' intervention of INCA, on September 8, 1979, concluded a settlement agreement with H & J pursuant to which H & J was to refund to Bandes $420,000 and release INCA from its obligation to take delivery of the steel billets. The approximately $40,000 retained by H & J represented both a deduction of some $20,200 in payment of an obligation owed by INCA to H & J and the cost to H & J of the rescission.

Two days prior to the settlement, however, interventor Alvarez sent a telex to H & J stating that only the Nicaraguan State Fideicommissary was authorized to represent INCA, that he was that Fideicommissary, and that INCA was presently under investigation by the state and was operating under government administration. The clear intention of the telex was to put

into question the authority of Bandes to represent INCA in any transactions and particularly in the settlement agreement finalized two days thereafter.

Confronted with this development, H & J turned to this court, interpleading Bandes and Alvarez, both of whom move for summary judgment. Central to the resolution of the issues before me are the decrees and acts of La Junta de Gobierno de Reconstruccion Nacional de la Republica de Nicaragua (the "Government Council") following its take-over on July 19, 1979.

On July 20, 1979, the Government Council issued Decree No. 3,[1] thereby empowering the Attorney General of Justice of Nicaragua "to proceed immediately with the intervention, requisition and confiscation of all assets of the Somoza family, military personnel and civil servants who have abandoned the country since December, 1977." On July 22, 1979, the Government Council, by the issuance of Decree No. 10,[2] declared that "presidents, directors, managers, administrative heads of departments and/or those responsible for any working equipment in private business that refuse to go back to work, abandon it or hinder the

working of these businesses" have committed a crime, carrying a "penalty from 3 months to 2 years of public service." Decree No. 10 also empowered the state, "through the competent authorities, to intervene those businesses whose proprietors abandon them or refuse to put them back in operation."[3]

Some six days later the holdings of Bandes and his family in INCA were "intervened" by the Attorney General[4] and the shares of INCA held by Somoza were "confiscated." At the same time, the Attorney General authorized the Fideicomiso de Reconstruccion Nacional ("Fideicomiso") to be the administrator of INCA with the power

> To represent the company in and outside of Nicaragua, in the capacity of General Administrator; [and] to represent the stock which was intervened in the General Assembly.

David Alvarez was thereupon appointed representative of the Fideicomiso and interventor of INCA. Three others were appointed to represent the INCA shares of the Bandes family and the Nicaraguan government at a general assembly of the share-

---

1. Decree No. 3, titled "Confiscation of Assets," states, in pertinent part:

   the Attorney General of Justice is empowered to proceed immediately with the intervention, requisition and confiscation of all of the assets of the Somoza family, military personnel and civil servants who have abandoned the country since December, 1977. (The text of all decrees reprinted in this opinion is taken from *La Gaceta,* the official journal of the Government Council. The original appears in Spanish. The translation used was provided by interpleader defendant Alvarez.)

2. Decree No. 10, titled "Law of National Emergency," states, in pertinent part:

   *Art. 2.* There will be a penalty from 3 months to 2 years of public service for those that incur any of the following crimes: ...

   b) The presidents, directors, managers, administrators and heads of departments and/or those responsible for any working equipment in private business that refuse to go back to work, abandon it or hinder the working of these businesses....

   \* \* \* \* \* \*

   *Art. 7.* The state is hereby empowered, through the competent authorities, to intervene those businesses whose proprietors

abandon them or refuse to put them back in operation.

3. There is a fundamental dispute over the meaning of the term "intervention." Bandes, by his counsel, contends that the "intervention" of his assets is tantamount to a confiscation, *i.e.,* a permanent taking. Alvarez, by counsel, characterizes the intervention as a step significantly short of a permanent taking. Alvarez contends that Bandes's rights to his INCA property have not been finally determined.

4. Bandes also notes that at this same time his shares in Envasas CentraAmericas, S.A. ("Enva Casa"), a second corporation, were intervened as well. Moreover at other times his papers refer to other property he claims he lost in Nicaragua, such as his home. By these references, Bandes appears to be endeavoring to counter Alvarez's argument that he has already been compensated for his INCA property by other retained and diverted INCA funds. Inasmuch as I conclude that Alvarez's premise is of no operative significance in view of the controlling impact of the Act of State Doctrine, Bandes's factual assertions as to other intervened property are irrelevant.

holders of INCA which was to be held on August 1, 1979.

On that same date, a meeting of these newly appointed representatives was held and the following actions—the legitimacy of which Bandes strenuously contests— were taken. Bandes and his wife were removed from their positions as officers of INCA; Bandes and the previous board of directors were stripped of all powers and mandates, and expressly the power to represent INCA in any type of litigation or contract; a new board of directors was appointed to manage INCA, and Alvarez was granted a General Power of Administration. Alvarez now continues to administer and represent INCA under the authority of the Corporacion Industrial de Pueblo, the institutional successor to the Fideicomiso.

On November 21, 1979, the Government Council issued Decree No. 172[5] and thereby suspended the application of Decree No. 38,[6] prohibited new interventions, confiscations, requisitions, or attachments, and determined that, as to property which had already been intervened but about which a verdict of confiscation had not been entered, the Attorney General should have the sole power to try such cases.

On February 7, 1980, the Government Council issued Decree No. 282.[7] That decree regulated the status of "natural persons who are outside Nicaragua" whose "assets were intervened or in any other way affected ... under Decree No. 38." It required that persons, such as Bandes, wishing to contest the intervention of their property, "do so personally before the Justice Attorney General's Office within the unextendable period of 30 days." Moreover, Decree No. 282 dictated that persons

5. Decree No. 172, titled "Suspension of the Application of Decree No. 38," states, in pertinent part:

> *Art. 1.* A suspension of the application of Decree No. 38 ... is hereby declared.
> *Art. 2.* Consequently, beginning on this date it shall not be possible under any circumstance to decree new interventions, attachments, requisitions or confiscations of movable and immovable properties, vehicles or livestock, nor to freeze current accounts, savings accounts and deposit certificates.
> *Art. 3.* The cases of requisition, occupation or intervention of assets over which a verdict of confiscation has not been issued on the date of the present Decree, shall be solely tried by the Attorney General's office and all such cases which are being examined in fact or under law shall be submitted to said office by any civil or military authority anywhere in the national territory...

6. Decree No. 38, titled "Clarification and Addition to Decree No. 3," states, in pertinent part:

> *Art. 1.* The faculties conferred upon the Attorney General in Decree No. 3 ... also shall include the freezing or intervening preventively in any transaction, whether it be goods or an enterprise, of any persons who are followers of the "somocismo," have been accused or that by information of the same Attorney General's office should consider wise to be preventively detained....
> *Art. 2.* Pending are the rights of the persons that were not included and who consider themselves prejudiced by the application of Decree No. 3 and the present decree, who may present themselves before the Attorney

General's office to express the reasons they consider relevant.

7. Decree No. 282, titled "Judicial Status of Persons Whose Assets Have Been Intervened or Are Under Investigation," states, in pertinent part:

> *Art. 1.* The present law regulates the judicial status of natural persons who are outside of Nicaragua, as well as of those judicial persons, whichever their domicile may be, if in one or another case they can be included in either of the following circumstances: ...
> b) That their assets were intervened or in any other way affected by the ... Attorney General's Office under the Decree No. 38 ....
> *Art. 2.* Persons included under the above mentioned article who desire to impugn the actions that gave place to cases contemplated in said article, must do so personally before the Justice Attorney General's Office within the unextendable period of 30 days beginning of the enforcement of the present law ....
> In dealing with incorporated companies ... the appearance shall be made with the personal, physical presence of natural persons who held, before the 19th of July, 1979, the legal representation of same companies ....
>
> \* \* \* \* \* \*
>
> *Art. 5.* Persons included in Article 1, who do not make use of the rights herein granted to them within the unextendable period established, shall lose whatever rights they may have over the affected assets, which shall become, without indemnity, the property of the State.

within its scope who failed to appear in person to contest the taking of their property within the said 30 days would "lose whatever rights they may have over the affected assets, which shall become, without indemnity, the property of the State." Pursuant to this Decree one such as Bandes—whom the current Nicaraguan government claims has abandoned his factory and thereby committed a crime—was required to appear personally in Nicaragua to object to the seizure of his property or, failing that, at the end of the 30-day period, forfeit it to the State without compensation. Neither Bandes nor any member of his family appeared within the said unextendable 30-day period to contest the taking.

On May 2, 1980, well beyond the 30-day period allowed in Decree 282, *supra,* the Government Council by Decree No. 422 terminated the power of the Attorney General to confiscate property on the basis of a property owner's failure to personally appear in order to defend his property rights. Decree No. 422 requires the Attorney General to institute an action in the ordinary courts of Nicaragua in order to effect a confiscation,[8] with a property owner entitled to notice and an opportunity to be heard either in person or by counsel. Notwithstanding statements in Alvarez's memorandum to the contrary, the Nicaraguan authorities appear to be proceeding on the premise that Bandes's ownership had already passed to them by forfeiture under earlier Decree No. 282. The Attorney Gen-

eral's office has not instituted any action against Bandes under Decree No. 422 and his stock remains intervened.[9]

On October 1, 1979, Bandes assigned his rights to the settlement agreement fund to his wife in exchange for $1.[10]

Both Bandes and Alvarez on their respective motions for summary judgment focus for the most part either on the legitimacy and effect of Alvarez's appointment as interventor of INCA, or the extra-territorial application of the Act of State Doctrine, or the compensation due or not due to Bandes as a consequence of his loss of property in Nicaragua. In view of my conclusion that the Act of State Doctrine, as applied to the conceded facts, entitles Bandes to prevail, I discuss other contentions only to the extent that they raise issues which are otherwise not decided.

█ Chief Justice Fuller offered the classic formulation of the Act of State Doctrine in *Underhill v. Hernandez,* 168 U.S. 250, 18 S.Ct. 83, 42 L.Ed. 456 (1897), at 252, 18 S.Ct., at 84:

> Every sovereign State is bound to respect the independence of every other Sovereign State, and the courts of one country will not sit in judgment of the acts of the government of another done within its own territory. Redress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves.[11]

**8.** Decree No. 422, titled "Confiscation of Assets," states, in pertinent part:

> *Art. 1.* The cases of ... intervention of assets which are found to date to be known by the Ministry of Justice by virtue of the Decrees 38 ... and 282 ... and upon which a definitive resolution of confiscation has not been prescribed, will pass to the ordinary Courts, cases to be tried in accordance with the procedure which is determined in this Law.

**9.** Bandes contends that by operation of Decree No. 282, art. 5, his failure to appear before the Attorney General has caused him to finally lose whatever rights he may have had over his INCA assets. Alvarez, on the other hand, contends that Decree No. 282 is not self-executing as to these assets but rather that any final

determination of rights must be made pursuant to Decree No. 422.

**10.** Bandes's assignment of his rights to the interpleader fund to his wife and her corresponding appointment of him as representative for purposes of this action is of no consequence to the determination herein. Either Alvarez's appointment is to be given effect or not. In either case, Bandes is before the court as the pre-intervention representative of the management of INCA.

**11.** A more recent statement of the Act of State Doctrine is set forth in the *Sabbatino* case, 376 U.S. at 428, 84 S.Ct. at 940:

> the Judicial Branch will not examine the validity of a taking of property within its own

So stated, the doctrine recognizes first, that to the extent that the United States has an interest in the internal affairs of a foreign sovereign, that interest is best represented by the executive branch, and second, that, in any event, the United States courts are without power to enforce their decrees as they apply to property held extra-territorially without the consent of the foreign sovereign. For these reasons, where the property in issue is within the jurisdiction of the foreign sovereign, the Act of State Doctrine, which counsels a "hands off" approach, is "applicable even if international law has been violated." *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 431, 84 S.Ct. 923, 942, 11 L.Ed.2d 804 (1964).[12]

■ Nevertheless, when the confiscated property is located not within the borders of the foreign sovereign but within the jurisdiction of the United States courts, the policies mandating a hands-off attitude no longer apply with the same force. Traditionally, the judiciary has exercised control over property located within the borders of the United States. More importantly, the United States courts have the power to enforce their orders as they affect domestically held property. Therefore, a corollary to the Act of State Doctrine has evolved: "when property confiscated [by a foreign sovereign] is within the United States at the time of the attempted confiscation, our courts will give effect to the acts of [the foreign] state 'only if they are consistent with the policy and law of the United States'." *Republic of Iraq v. First National City Bank,* 353 F.2d 47, 51 (2d Cir.1965), quoting, ALI, *Restatement of Foreign Relations Law of the United States* § 46 (Proposed Official Draft 1962);[13] *accord, Banco*

---

territory by a foreign sovereign government, extant and recognized by this country at the time of suit, in the absence of a treaty or other unambiguous agreement regarding controlling legal principles, even if the complaint alleges that the taking violates customary international law.

**12.** The *Sabbatino* case arose out of a contract to purchase Cuban sugar, free alongside the steamer, entered into between an American commodity broker and a Cuban corporation ("C.A.V."), owned principally by American nationals in February and July of 1960. While the steamer loaded with the sugar stood offshore but within the jurisdiction of Cuba, the Cuban government issued an order expropriating the assets of certain listed companies, including C.A.V. Prior to the sailing of the steamer with its cargo, the same American commodity broker entered into a contract with the Banco Para el Comercio Exterior de Cuba, an instrumentality of the Cuban government, covering sale and transfer of the cargo. Thereafter, the representative of the C.A.V. and the representatives of the Cuban Government turned to the United States courts to determine who was the rightful payee on the commodities broker's obligation upon receipt of the sugar.

After reviewing the history of the Act of State Doctrine and its rationale, the Supreme Court determined that the property that was the subject of the expropriation, *i.e.,* the sugar, was located in Cuba at the time of its seizure by the Cuban Government. The Court concluded that the Act of State Doctrine wisely forbade the "Judicial Branch [from examining] the validity of a taking of property within its own territory by a foreign sovereign government." 376 U.S. at 428, 84 S.Ct. at 940.

**13.** In *Republic of Iraq,* an issue arose between the administrator of the estate of King Faisal II of Iraq and representatives of the Republic of Iraq over certain funds and securities held by the Irving Trust Company in New York. The Court of Appeals for the Second Circuit, after reviewing the history of the Act of State Doctrine concluded that the location of the contested property in dispute determined whether the doctrine was to be applied:

Under the traditional application of the act of state doctrine, the principle of judicial refusal of examination applies only to a taking by a foreign sovereign of property *within its own territory;* when property confiscated is *within the United States* at the time of the attempted confiscation, our courts will give effect to acts of state "only if they are consistent with the policy and laws of the United States." 353 F.2d at 51 (citations omitted) (emphasis added).

Applying this standard to the facts, the court decided that:

Extra-territorial enforcement of the Iraqi ordinance as to property within the United States at the date of its promulgation turns on whether the decree is consistent with our policy and laws. We perceive no basis for thinking it to be. Confiscation of the assets of a corporation has been said to be "contrary to our public policy and shocking to our sense of justice." Confiscation of the assets of an individual is no less so, even if he wears a crown. 353 F.2d at 51 (citations omitted).

*See, also, Maltina Corporation v. Cawy Bottling Company,* 462 F.2d 1021 (5th Cir.1972); *Zwack v. Kraus Bros. & Co.,* 93 F.Supp. 963 (S.D.N.Y.1950), *aff'd,* 237 F.2d 255 (2d Cir. 1956).

*Nacional de Cuba v. Chemical Bank of New York,* 658 F.2d 903 (2d Cir.1981).

Keeping the foregoing in mind, I turn to Bandes's specific contentions.

■ Bandes initially contends that pursuant to Nicaraguan corporate law, the appointment of Alvarez as administrator of INCA was invalid because certain Nicaraguan legal requirements, among others, were not met: 1) the revocation of his most general power of attorney was never embodied in a deed registered with the official notary; 2) he did not receive requisite notice thereof; and 3) the August 1, 1979 shareholder meeting, at which Alvarez was appointed administrator and Bandes was stripped of power, was improperly constituted. In these particulars, Bandes's contention is similar to one raised—and rejected by the Supreme Court—in *Banco Nacional de Cuba v. Sabbatino, supra.* In *Banco Nacional,* the representative of a Cuban corporation challenged a decree of expropriation on the ground, *inter alia,* that the decree had not been published in the official newspaper as required by Cuban law. The Supreme Court, holding that the Act of State Doctrine barred scrutiny of precisely this kind of question, stated:

> An inquiry by United States courts into the validity of an act of an official of a foreign state under the law of that state would not only be exceedingly difficult but, if wrongly made, would be likely to be highly offensive to the state in question. Of course, such review can take place between States in our federal system, but in that instance there is similarity of legal structure and an impartial arbiter, this Court, applying the full faith and credit provision of the Federal Constitution. Another ground supports [this] resolution of [the] problem . . . . Were

any test to be applied it would have to be what effect the decree would have if challenged in Cuba. If no institution of legal authority would refuse to effectuate the decree, its "formal" status—here its argued invalidity if not properly published in the Official Gazette of Cuba—is irrelevant. It has not been seriously contended that the judicial institutions of Cuba would declare the decree invalid.

376 U.S. at 415 n. 17, 84 S.Ct. at 934 n. 17.

The foregoing requires rejection of Bandes's first contention. The Attorney General of Nicaragua plainly authorized the appointment of an administrator for INCA and vested that administrator—Alvarez—with the power "to represent the company in and out of Nicaragua" and "to represent the stock which was intervened." The shareholder assembly of INCA plainly endeavored to expressly revoke Bandes's power to represent INCA in litigation and contractual matters. Further inquiry into Nicaraguan law is not permitted.

Bandes next contends that Alvarez's authority to represent INCA, at face value, does not entitle him to take the interpleader fund because it fails to invest him with the power to represent INCA in this proceeding. Specifically, he contends that prior to his flight from Nicaragua he was vested with INCA's most general power of attorney, *i.e.,* the broadest authorization to act on the behalf of a corporation available pursuant to Nicaraguan law. He claims that Alvarez has been vested with a lesser authorization and that there is no reason for this court to create a further power of confiscation in Alvarez than the Government Council has given him. *See, Tabacalera Severiano Jorge, S.A. v. Standard Cigar Co., supra,* 392 F.2d at 714.[14]

---

**14.** *Tabacalera* involved an action to recover certain accounts receivable owed by the Standard Cigar Company, a Tampa-based corporation. Prior to the revolution in Cuba which brought Fidel Castro to power, Severiano Jorge, an individual, owned and operated the corporation which bore his name and which was engaged in the business of selling Cuban tobacco to United States cigar manufacturers. Before Castro's installation, Jorge fled Cuba

and settled in the United States. Subsequently, the Cuban government intervened the corporation.

The subject of the dispute in *Tabacalera* was a debt owed by Standard Cigar to the corporation on account of the sale of tobacco prior to the intervention decree. Jorge claimed that his most general power of attorney—which entitled him to comprehensive control of the corporation—also entitled him to the disputed debt;

Apart from the *Tabacalera* case, I have found no other authorities supporting this "under-appointment" doctrine and I question its vitality. In a close case where the terms of a new representative's, *e.g.* Alvarez's, appointment, may or may not supervene the powers of the existing representative, *e.g.*, Bandes, the inquiry which a court must undertake to unravel the chain of authority invites the same risks which the Act of State Doctrine seeks to foreclose. Moreover, in *Tabacalera* itself, the court raised the Act of State bar as an alternative ground for its holding. 392 F.2d at 714. I believe that that remains the better course in this instance.

■ Second, even if I were to reach the authorization question, the plain language of Alvarez's appointment appears to dispose of Bandes's contention. Alvarez was authorized "to represent the company in and out of Nicaragua" and "to represent the stock which was intervened." Bandes's contention that his authority remains senior to Alvarez's is insufficient in the face of such broad language.

■ Bandes's third and final contention is that, as a practical matter, the actions of the Government Council, particularly the enactment of certain laws and the intervention of INCA, need not be given effect because a) the interpleader fund lies within the United States and b) the confiscatory actions of the Government Council are not consistent with the policy and the laws of the United States. Bandes asserts that this

court must therefore ignore the confiscatory conduct and regard the situation as if the confiscation had never occurred. Given this, Bandes urges that under traditional principles of domestic and international law he is entitled to the interpleader fund. I agree.

A few relevant and undisputed facts mandate this result. Prior to the advent of the hostilities in Nicaragua, Bandes unquestionably was the principal representative of INCA. He owned and controlled a majority of its shares and he was duly empowered to act on its behalf. Absent the intervening actions of the Government Council, there can be no doubt that Bandes is the proper party to receive the debt owed by H & J. Since the Council's actions affect property held in the United States, it is incumbent on me to scrutinize those which purport to divest Bandes of his rights to the fund in order to determine whether pursuant to policies of domestic and international law such actions should be sustained by the United States courts.

Decrees 3, 10, and 282, all promulgated in July, 1979, are in issue. Decree No. 3 empowered the Attorney General to intervene Bandes's property, Decree No. 10 fixed criminal penalties for the "abandonment" of property, and Decree No. 282 disallowed any challenge to the intervention unless made in person within an unextendable period of 30 days and mandated forfeiture without payment for failure to challenge. While it may be argued that on its face

---

he claimed further that American law need not give extra-territorial effect to confiscatory decrees by foreign sovereigns. The Cuban interventor contended, on the other hand, that it was the rightful representative of the corporation, that the intervention was valid and enforceable by the United States courts, and that he was the rightful recipient of the fund.

In deciding in favor of Jorge, the court closely examined the powers granted to the Cuban interventor. It noted that he was neither explicitly empowered to sue to collect outstanding debts nor was he granted an express power of attorney. 392 F.2d at 713. The court therefore concluded that there was no reason to enlarge the powers granted to the interventor. Since those powers granted did not include the power the interventor was seeking to exercise

in the dispute before it, the court ruled in favor of Jorge. However, on more traditional grounds, the court held that it need not give extra-territorial effect to a decree which under American law would be viewed as confiscatory. It explained:

we conclude that in light of the fact that the government of Cuba did not have physical control over the species of property represented by this claim against Standard Cigar Company, it would not be a violation of the Act of State Doctrine for the courts to hold that, had the Cuban government taken all of the steps that its unlimited power would have permitted it to take, such conduct by the Cuban government would not be recognized by the United States courts.

392 F.2d at 714.

Decree No. 422, promulgated some time after the INCA forfeiture, in some way mitigated the harshness of the prior decrees, their net effect was (1) to wrest control and ownership of INCA from Bandes and lodge it in the Government Council through the agency of Alvarez and (2) to restrict Bandes's right to protest his loss in a way which put his personal safety at peril.

■ Of course, were these same events to occur in our domestic system the Fifth Amendment to the United States Constitution would proscribe the uncompensated taking of property by the state. Although our Constitution does not apply to a taking in Nicaragua, this same policy has been applied to matters where the taking was effected not by a governmental entity in our federal system but by a foreign sovereign. As our Court of Appeals has explained, *Republic of Iraq, supra,* 353 F.2d at 52:

> It is true that since [the Fifth Amendment and other provisions of the Constitution] are addressed to action by the United States or a state, they might not prevent a court of the United States from giving effect to a confiscatory act of a foreign state with respect to property in the United States. But at least they show that, from its earlier days under the Constitution, this nation has had scant liking for legislative proscription of members of a defeated faction, although—or perhaps because—many states, in their dealings with property of the loyalists immediately after the Revolution, had practiced exactly that. Foreigners entrusting their property to custodians in this country are entitled to expect this historic policy to be followed save when the weightiest reasons call for a departure.
>
> ... [T]he policy of the United States is that there is no such thing as a "good" confiscation by legislative or executive decree.

Thus, where there has been a taking without compensation by a foreign state and that state thereby purports to reach property within the United States, the taking will not be given effect. Moreover, the act of state by which the foreign government sought to achieve its taking will be rendered a nullity for the purpose of property within the United States.

Applying this principle to the facts now before me, I find that the decrees of the Government Council do constitute a taking without compensation, that such a taking is "contrary to our public policy and shocking to our sense of justice," *Republic of Iraq, supra,* 353 F.2d at 51, and that as a result the consequence of the decrees, *i.e.,* the appointment of Alvarez and his claims on the fund, are a nullity. Bandes, by virtue of his status prior to the taking is entitled to the interpleader fund.

Alvarez has argued that the intervention of Bandes's INCA holdings does not constitute a permanent taking but rather is only an intermediate step which still affords Bandes a right to protect and seek redress. Nevertheless, the possibility of redress pursuant to the procedures set up by the decrees may well be deemed illusory. *Cf. Banco Nacional de Cuba v. Sabbatino, supra,* 376 U.S. at 402 & n. 4, 84 S.Ct. at 927 & n. 4.[15] Bandes should not be forced to imperil his person to demonstrate to this court that the intervention of his assets is in fact a confiscation. The failure of the Government Council to deprive Bandes of technical title to his INCA assets at this time does not make Bandes's loss any less final. *See, F. Palicio y Compania, S.A. v. Brush,* 256 F.Supp. 481, 488 (S.D.N.Y.1966), *aff'd* 375 F.2d 1011 (2d Cir.1967).

In view of my disposition of Bandes's motion for summary judgment, Alvarez's cross-motion for summary judgment is denied. It is appropriate, however, to address two contentions raised therein: first, that Bandes is not entitled to compensation for property he lost in Nicaragua either be-

**15.** In the *Sabbatino* case, 376 U.S. at 402 & n. 4, 84 S.Ct. at 927 & n. 4, the Supreme Court took a similar view finding that the possibility of payment for expropriated property by means of 30 year, 2% notes was "illusory."

964

cause his property there was valueless or because he has already been sufficiently compensated therefor, and second, the argument that he has abandoned INCA.

Alvarez's compensation argument, as I view it, misconceives the issue. This is not a valuation proceeding and my authority does not empower me to act as some sort of Nicaraguan Court of Claims to determine such issues. This, then, leaves before me only the task of applying the Act of State Doctrine. *See Republic of Iraq v. First National City Bank, supra.* The interpleader fund is the property of INCA; it is to be taken by the rightful representative thereof. Insofar as the facts and precedent dictate that I not give effect to the intervention of INCA's assets, Bandes remains the duly empowered representative of INCA.

For much the same reason, Alvarez's abandonment argument fails. It is Bandes's status as the representative of INCA that entitles him to take what is INCA's—the interpleader fund. Not having been displaced under circumstances which policy requires me to accept, Bandes continues to possess the authority he held before the hostilities.

Bandes's motion for summary judgment is granted, and that of Alvarez is denied. Submit order on notice.