Salvador BANDES, Plaintiffs,

v.

HARLOW & JONES, INC., Defendant.

HARLOW & JONES, INC., Interpleader–Plaintiff,

v.

Salvador BANDES and David Alvarez, Interpleader–Defendants.

No. 79 Civ. 5091 (RO).

United States District Court, S.D. New York.

May 25, 1993.

Reboul, MacMurray, Hewitt, Maynard & Kristol, New York City, for Jorge S. Bandes.

Rabinowitz, Boudin, Standard, Krinsky & Lieberman, P.C., New York City, for Republic of Nicaragua.

Weintraub, Weintraub, Seiden & Orshan, Miami, FL, for Jose R. Somoza.

Olga Bandes Wagui Valle, pro se.

Rosa de Bandes, pro se.

Dr. Emilio Bandes Wagui, pro se.

Ulises Carillo, pro se.

## MEMORANDUM AND ORDER

OWEN, District Judge.

The Report and Recommendation of Magistrate Judge Bernikow is hereby made the order of this court.

## REPORT AND RECOMMENDATION

BERNIKOW, United States Magistrate Judge.

This is an interpleader action. Before the court are Daniel Fajardo, representing the Corporacion Industrial de Pueblo, ("COIP"), a Nicaraguan executive agency administering confiscated corporations, and Jose Somoza, each claiming interest in the interpleader fund corresponding to 25,028 shares of stock in a Nicaraguan company, Industria Nacional de Clavos y Alambres de Puas, known as INCA. Also before the court are various members of the Bandes family contesting each other's and COIP's right to share in the fund. In a previous decision, the district court apportioned the fund in question according to the claimants' *pro rata* stake in INCA by creating the fiction of corporate dissolution and treating the interpleaded fund as the sole corporate asset. *See Bandes v. Harlow & Jones, Inc.*, 570 F.Supp. 955,

963 (S.D.N.Y.1983), *aff'd. in pertinent part,* 852 F.2d 661, 666 (2d Cir.1988). COIP and Jose Somoza have cross-moved for summary judgment; resolution of the conflicting claims submitted by various parties will permit division of the remainder of the interpleaded fund.

## BACKGROUND

### SOMOZA/COIP ADVERSE CLAIMS

This interpleader action relates to a debt owed INCA, a Nicaraguan steel products corporation, by Harlow & Jones, ("Harlow"), a Stamford, Connecticut corporation. The parties have litigated entitlement to the interpleaded fund and familiarity with the resulting decisions is assumed. In brief, Salvador Bandes and his family controlled INCA prior to the 1979 Sandinista victory in the Nicaraguan civil war. In 1976, apparently as a condition of doing business in Nicaragua, Bandes sold 25,028 shares, approximately 18.2 percent, of his INCA stock to Jose Somoza, Inspector General of the Nicaraguan Army (and the dictator General Anastasio Somoza's brother) and five hundred shares to General Ulises Carillo, another Nicaraguan officer. Bandes was allegedly paid for the stock, but INCA also enjoyed various tax benefits and customs duty exemptions courtesy of the ruling Somoza family following the transaction. After Somoza's purchase, Salvador Bandes and members of his family owned approximately 72.9% of INCA's stock; various others held the remainder.

In 1978, INCA ordered steel billets from Harlow, paying $460,000 in three installments in early 1979. The billets, however, were never delivered. Shortly thereafter, an imminent Sandinista victory compelled Bandes to flee to Honduras. The INCA factory was almost totally destroyed in the war.

Anastasio Somoza resigned as President of Nicaragua on July 17, 1979 and fled with his family to Paraguay. The Sandinista Govern-

ment Council quickly confiscated their assets. On July 20, 1979, the Nicaraguan Government Council issued Decree No. 3, titled Confiscation of Assets: "the Attorney General of Justice is empowered to proceed immediately with the intervention, requisition and confiscation of all of the assets of the Somoza family, military personnel and civil servants who have abandoned the country since December 1977." [1] Two days later, the Sandinistas issued Decree No. 10, directing the Attorney General to "intervene" the property of "presidents, directors, managers ... or those responsible for any working equipment in private business that refuse to go back to work, abandon it or hinder the working of these businesses." [2] Decree No. 10 also imposed criminal sanctions on those who had fled the country during or after the war. Intervention could be contested by personal appearance before the Attorney General, but failure to personally appear within thirty days of an intervention resulted in escheatment of disputed property.

The Sandinistas intervened the INCA factory and stock held by several members of the Bandes family. The shares of Jose Somoza and Ulises Carillo were confiscated pursuant to Decree No. 3. Having fled their country at the end of the war, none of these people could return to contest the interventions without risking imprisonment under Decree No. 10.

Following promulgation of Decrees 3 and 10, the Attorney General created the Fidiecomiso de Reconstuccion Nacional to administer intervened property and industry. David Alvarez was appointed Fideicommissary (Fiduciary) of INCA and three others were appointed to represent the INCA stock formerly owned by members of the Bandes family and Somoza. On August 1, 1979, these appointees voted to remove Somoza and the Bandeses from the Board of Directors and stripped them of power to con-

---

1. Text of Decree Nos. 3 and 10 taken from *Bandes,* 570 F.Supp. at 957 n. 1 and n. 2 respectively.

2. In the earlier proceedings Nicaragua urged that intervention does not have the finality of confiscation, but is merely an intermediary stage of seizure subject to hearing. The District Court

rejected any distinction between intervention and confiscation: "failure of the Government Council to deprive Bandes of technical title to the INCA assets at this time does not make his loss any less final." *Bandes,* 570 F.Supp. at 963. In any event, under Decree No. 3, Somoza's property was confiscated, not intervened.

tract or litigate on behalf of INCA. In their place, Alvarez was given general power of administration.

Pursuant to a long-held power of attorney, Bandes subsequently negotiated INCA's release from the steel billet contract and the return of $420,000 INCA had already paid Harlow. Harlow agreed to keep approximately $40,000 for payment of an earlier debt owed Harlow by INCA and as compensation for rescission of the billet contract. Prior to consummation of this settlement, however, Alvarez contacted Harlow and informed it that he alone was authorized to represent INCA.

Bandes filed suit against Harlow in the Southern District of New York on September 25, 1979 seeking payment of the $420,000; Harlow promptly interpleaded Bandes & Alvarez and paid the $420,000 into the court. Both parties sought summary judgment.

Judge Owen granted Bandes's motion.[3] The court held that the Sandinista interventions were confiscations contrary to United States policy and unworthy of recognition; accordingly, "the appointment of Alvarez and his claims on the fund [were] a nullity." *Bandes v. Harlow & Jones, Inc.*, 570 F.Supp. 955, 963 (S.D.N.Y.1983). Judge Owen also ordered that unrepresented shareholders be given notice and an opportunity to claim a portion of the interpleader fund. The Second Circuit characterized the district court's decision as "creating the fiction of a corporate dissolution" and affirmed in pertinent part. *Bandes v. Harlow & Jones, Inc.*, 852 F.2d 661, 666 (2d Cir.1988). Consistent with the procedure for corporate dissolutions, by order dated June 22, 1987, Judge Owen referred this matter to me for the purpose of providing INCA shareholders notice of the fund and permitting them to claim that portion of the fund corresponding to their *pro rata* stock ownership prior to the Sandinista victory.

Several significant developments followed the Second Circuit's decision. Defeating Sandinista leader Daniel Ortega, Violeta Chamorro was elected President of Nicaragua and inaugurated on April 24, 1990. On May 17, 1990, President Chamorro issued Government Decree 11–90, implementing a procedure to return property confiscated by the Sandinistas. Decree 11–90 established a National Review Commission of five members, headed by the Attorney General and charged with resolving claims on the basis of the commission's majority vote. Claimants were required to petition for the return of their property by December 31, 1990.

Somoza was apparently aware of Decree 11–90. He retained an attorney in Nicaragua sometime in December 1990 but missed the Review Commission's filing deadline by two days. The parties agree that a remedy pursuant to Decree 11–90 is no longer available. Nevertheless, Decree 11–90 was declared unconstitutional in part by the Corte Suprema de Justicia [Nicaraguan Supreme Court] Ruling of Partial Unconstitutionality No. 27, May 17, 1990.

Four days after the Corte Suprema's decision, President Chamorro enacted Decree 23–91. This decree reaffirms the goal of its predecessor, Decree 11–90, namely, to return to its owners property confiscated by the Sandinistas, and sheds some light on the jurisdictional problems of the earlier decree:

> In accordance with the rulings of the Supreme Court of Justice, it is hereby recognized that the Executive Branch does not have the power to resolve conflicts of interests or rights between individuals, inasmuch as it is the judiciary alone that wields such power. With respect to the return of properties, the Executive can only rule on those properties which may be in its hands or under its control.

Decreto 23–91, Articulo 6.

The Corte Suprema's ruling on Decree 11–90 and subsequent enactment of Decree 23–91 does not appear to effect Somoza's chance for reconsideration of his belated claim. His property is currently administered by COIP, an executive agency and the institutional successor to the Fideicomiso, itself a creature of

---

**3.** Salvador Bandes assigned his INCA rights to his wife, Georgette Bandes, and she eventually received a pro rata share of the interpleader fund corresponding to Salvador's 72.9% share of INCA stock.

the executive branch. Decree 23–91 provides, in Articles 6 and 11, that the Executive is solely empowered to dispose of property under its control. The executive branch, in the form of the Attorney General's National Review Commission, has already ruled that Somoza procedurally defaulted by missing the December 31, 1990, filing deadline.

Additionally, Decree 23–91 is not intended to provide those who failed to file under 11–90 a second opportunity to petition for return of their property. As reported by Radio Nicaragua on September 9, 1992, on the occasion of establishing the National Revision Commission—an apparent successor to the defunct National Review Commission created by Decree 11–90—Attorney General Guillermo Vargas Sandino said "... the National Revision Commission will be reestablished with some variations regarding the Commission that existed previously ... It will be tasked with reviewing the cases of all those persons who took advantage of Decree 11–90 published in the early stages of the Chamorro administration." British Broadcasting Corporation, Summary of World Broadcasts, September 11, 1992.

By Order dated October 8, 1991, Judge Owen again referred this matter to me, this time for the purpose of resolving conflicting claims to the interpleaded fund. Jose Somoza and Nicaragua both claim that portion of the fund corresponding to the 25,028 shares Somoza owned prior to the intervention. Nicaragua is represented by Daniel Fajardo, representing the COIP, the institutional successor to the Fideicomiso.

DISCUSSION

A. *Act of State Doctrine*

■■■ The threshold question is whether the Act of State Doctrine, which limits the ability of United States courts to adjudicate claims arising from the actions of foreign sovereigns within their own borders, precludes this court's examination of the confiscation of INCA. The Supreme Court articulated the doctrine in *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 428, 84 S.Ct. 923, 940, 11 L.Ed.2d 804 (1964):

the Judicial Branch will not examine the validity of a taking of property within its

own territory by a foreign sovereign government, extant and recognized by this country at the time of suit, in the absence of a treaty or other unambiguous agreement regarding controlling legal principles, even if the complaint alleges that the taking violates customary international law.

Two practical rationales underlie the doctrine. First, it permits the political arms of government, and the executive branch in particular, exclusive control over foreign policy. *Allied Bank International v. Banco Credito Agricola de Cartago,* 757 F.2d 516, 520 (2d Cir.1985). Second, when the disputed property is located in the foreign sovereign, it would likely be futile, to say nothing of arrogant, for a United States court to pronounce on the self-contained activities of an independent state. *See id.* at 521.

■■■ But because the doctrine is solely designed to limit the role of United States courts in foreign affairs of state, it is inapplicable when an independent sovereign seeks to extend a confiscatory decree to our shores. *Bandes v. Harlow & Jones, Inc.,* 852 F.2d 661, 666 (2d Cir.1988). When the disputed property is located here, United States courts are not required to automatically defer to foreign authority; seizure of local property pursuant to a foreign confiscatory decree will be permitted only if the taking comports with "the policy and law of the United States." *Republic of Iraq v. First Nat. City Bank,* 353 F.2d 47, 51 (2d Cir. 1965), *cert. denied,* 382 U.S. 1027, 86 S.Ct. 648, 15 L.Ed.2d 540 (1966). Accordingly, the location of the disputed property determines whether United States courts will invoke the Act of State Doctrine and acquiesce in the seizure or, alternately, scrutinize the proposed confiscation to ensure that it is consistent with United States legal norms. *See Allied Bank International,* 757 F.2d at 521.

■■■ Here, the disputed property is an interpleaded fund arising from a debt owed INCA by Harlow. The debt is located in the jurisdiction in which its seizure can be effected. *See Allied Bank International,* 757 F.2d at 521; *United Bank Ltd. v. Cosmic International, Inc.,* 542 F.2d 868, 874 (2d Cir.1976); *Libra Bank, Ltd. v. Banco Nacional de Costa Rica, S.A.,* 570 F.Supp. 870, 878 (S.D.N.Y.

1983). Harlow, domiciled in Connecticut, is subject to the jurisdiction of the United States and seizure of the fund can only be effected here, making the United States the situs of the debt. *Bandes*, 852 F.2d at 667; *cf. Harris v. Balk*, 198 U.S. 215, 25 S.Ct. 625, 49 L.Ed. 1023 (1905) (power to enforce payment of a debt depends on jurisdiction over the debtor). When property sought to be confiscated under a foreign decree is located here, judicial review designed to ensure that the taking is consistent with constitutional norms is appropriate. *Bandes*, 852 F.2d at 666; *see also Republic of Iraq*, 353 F.2d at 51.

### B. *Law of the Case*

■ The parties apparently agree on the historical and procedural history of this litigation, but they dispute the impact of previous decisions on the instant action. Somoza argues that his portion of the fund is beyond Nicaragua's reach because its confiscation of INCA, upon which its claim rests, has already been invalidated by the Second Circuit in the *Bandes* decision. The appellate court's repudiation of the INCA confiscation, Somoza argues, is the law of the case guiding this motion.

■ Under law of the case doctrine, a decision of a superior court at one stage of the litigation binds an inferior court on the same issue at later stages of the same litigation. *Diduck v. Kaszycki & Sons Contractors, Inc.*, 737 F.Supp. 792, 796 (S.D.N.Y. 1990), *aff'd. in part and rev'd. in part*, 974 F.2d 270 (2d Cir.1992) (quoting 1B J. Moore, W. Taggart & J. Wicker, Moore's Federal Practice ¶ 0.404[4–3] at 131 (2d ed. 1988)). With respect to decisions of the same court, the doctrine is discretionary, permitting a court to refuse to reconsider issues it has decided at an earlier stage in the same litigation. *Id.* The doctrine is applicable to both implicitly and explicitly decided issues. *Fogel v. Chestnutt*, 668 F.2d 100, 108 (2d Cir. 1981), *cert. denied*, 459 U.S. 828, 103 S.Ct. 65, 74 L.Ed.2d 66 (1982). As a practical mechanism to promote judicial efficiency, though, law of the case need not be blindly adhered to: "compelling circumstances, such as an intervening change of law, the availability of new evidence, the need to correct a clear error, or to prevent manifest injustice" permit a court to reconsider or disregard its earlier ruling. *Diduck*, 737 F.Supp. at 796–97.

The district court, noting that the basis for Nicaragua's claim to the fund was its confiscation of Bandes's company "contrary to public policy and shocking to our sense of justice," declined to recognize Nicaragua's ownership of INCA and consequently denied its claim. *Bandes*, 570 F.Supp. at 963 (quoting *Republic of Iraq*, 353 F.2d at 51). The Second Circuit agreed. *Bandes*, 852 F.2d at 667.

Somoza argues that the law of the case derived from the Second Circuit's opinion and binding on this court holds that Nicaragua may not share in the fund at issue because its confiscation of INCA, the foundation for the instant claim, violated United States legal norms. His analysis, however, fails to recognize why the seizure contravened United States policy. The Bandes's confiscation was invalid under United States law because Bandes was not compensated for, or given an opportunity to contest, the seizure of his property. *See Bandes*, 852 F.2d at 667–69. Further, the remediation procedures Nicaragua had in place at the time of seizure violated United States prohibitions against *ex post facto* legislation.[4] *Id.* at 669.

■ Somoza's interpretation of the Circuit's opinion overlooks a crucial corollary to the Act of State doctrine: foreign expropria-

---

**4.** The Second Circuit held that the intervention of INCA was a taking contrary to United States policy: "The guarantees of due process in the fifth and fourteenth amendments to our Constitution prohibit confiscations without just compensation." *Bandes*, 852 F.2d at 667. Addressing the local remedies issue, the court found that "although some of the decrees enacted after the seizure of INCA seem to be belated attempts to mitigate the harshness of the Sandinista 'intervention,' we agree with the district court's finding that those decrees make no meaningful difference ... courts should avoid extending the effects of another countries *ex post facto* legislation within our borders. We conclude Decree No. 10 belies the existence of a *bona fide* administrative remedy." *Id.*

tions meeting constitutional standards warrant United States recognition. *See Republic of Iraq*, 353 F.2d at 51; *Cf. Republic of Philippines v. Marcos*, 806 F.2d 344, 359 (2d Cir.1986) (dicta). Nicaragua now argues that Decrees 11–90 and 23–91 relocate the seizure within acceptable constitutional standards by providing an Somoza a due process mechanism to contest the taking.

Moreover, Decrees 11–90 and 23–91 were obviously not considered by previous courts. They amount to new evidence that the confiscation did not violate constitutional requirements. And, as stated, the availability of new evidence is a basis for not following the law of the case. *See, e.g., U.S. v. Yonkers Board of Education*, 856 F.2d 7, 11 (2d Cir. 1988). Accordingly, summary judgment of Nicaragua's claim on law of the case grounds is inappropriate.[5]

### C. *The So-called Local Remedy argument*

■ The remaining question, apparently one of first impression, is whether the asserted claim to Somoza's portion of the fund is rendered any less "shocking to our sense of justice" because Nicaragua has provided a means for Somoza to litigate, in Nicaragua, ownership of the INCA stock.

Somoza identifies ample authority supporting United States adjudication of claims to property located here but subject to foreign expropriation orders. *See, e.g., Bandes*, 852 F.2d at 667; *United Bank Ltd.*, 542 F.2d at 873; *Republic of Iraq*, 353 F.2d at 51; *cf. Tabacalera Severiano Jorge, S.A. v. Standard Cigar Co.*, 392 F.2d 706, 713 (5th Cir. 1968), *cert. denied*, 393 U.S. 924, 89 S.Ct. 255, 21 L.Ed.2d 260 (1968); *Boland v. Bank Sepah–Iran*, 614 F.Supp. 1166, 1174 (S.D.N.Y. 1985) (libel and discrimination against United States employees of Iranian bank litigated here).

But these cases, as well as the *Bandes* decisions, are inapposite because Nicaragua contends that it has enacted a procedure specifically mitigating the due process prob-

lems that led the Second Circuit to repudiate Nicaragua's seizure of Bandes's stock. Nicaragua asserts that the newly created procedure allows a review of confiscations consistent with United States due process principles.

Moreover, Nicaragua mentions that Somoza was plainly aware of the procedure and even belatedly attempted to avail himself of it. Prior to filing the instant claim, he filed a petition in Nicaragua pursuant to Decree 11–90 on January 2, 1991, missing the December 31, 1990 deadline by only one day (assuming that Nicaraguan courts are closed on New Year's Day), although Decree 11–90 provided for a 180 day period for filing such claims. Nicaragua urges this court to recognize, on the basis of international comity, the Nicaraguan default judgment stemming from Somoza's late filing. *See Ackermann v. Levine*, 788 F.2d 830, 841 (2d Cir.1986) (even foreign default judgment is afforded comity under international law unless it is "repugnant to fundamental notions of what is decent and just in the State where enforcement is sought") (2d Cir.1986) (cites omitted); *Mannington Mills, Inc. v. Congoleum Corp.*, 595 F.2d 1287, 1292 (3rd Cir.1979); *Drexel Burnham Lambert Group, Inc. v. Galadari*, 610 F.Supp. 114, 118 (S.D.N.Y.1985), *aff'd in part and vacated in part*, 777 F.2d 877 (2d Cir. 1985) (foreign decrees will be recognized by our courts even if the result would be different here); *cf. W.S. Kirkpatrick & Co. v. Environmental Tectonics Corp. Int'l.*, 493 U.S. 400, 110 S.Ct. 701, 107 L.Ed.2d 816 (1990). Because he failed to pursue his local remedy, Nicaragua argues, Somoza cannot now ask United States courts to ignore the ruling of competent Nicaraguan authorities.

■ The Supreme Court, in *Hilton v. Guyot*, 159 U.S. 113, 164, 16 S.Ct. 139, 143, 40 L.Ed. 95 (1895), described comity as:

> the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international

---

**5.** Whether the remediation procedure sufficiently comports with due process standards to permit the award of Somoza's share to Nicaragua remains to be determined. The issue, however, cannot be decided without a hearing. *See Drexel Burnham Lambert Group Inc. v. Galadari*, 777 F.2d 877, 881 (2d Cir.1985).

duty and convenience, and to the rights of its own citizens, or of other persons who are under the protections of its laws.

The decision of a foreign tribunal will be granted comity if that court had jurisdiction and if United States public policy and the rights of its residents are not violated. *Cunard S.S. Co. v. Salen Reefer Services. AB,* 773 F.2d 452, 457 (2d Cir.1985). Nicaragua's jurisdiction over the matter has not been questioned; indeed, Somoza belatedly attempted to avail himself of its procedure for the return of confiscated property. *See Sprague & Rhodes Commodity Corp. v. Instituto Mexicano Del Cafe,* 566 F.2d 861, 863 (2d Cir.1977).

Nevertheless, the procedures for contesting Sandinista confiscations must be examined to determine if they adequately uphold United States notions of due process. If so, confiscation of Somoza's property does not violate United States law. *Drexel Burnham Lambert Group Inc. v. Galadari* illustrates the point. There, Dubai, United Arab Emirates, established an *ad hoc* bankruptcy procedure effectively preventing plaintiff Drexel from collecting on a note given by the defendant. Drexel sought relief here but the district court held that the Dubai procedure was consistent with American bankruptcy law and dismissed the case on the basis of international comity. *Drexel,* 610 F.Supp. at 119. The Second Circuit, however, noted that this bankruptcy proceeding was Dubai's "first attempt to frame an insolvency law." *Drexel,* 777 F.2d at 881. Accordingly, limiting Drexel to the Dubai remedy sent it "into uncharted territory," and the appellate court remanded the case for an evidentiary hearing to determine if the Dubai proceedings were consonant with United States law. *Id.*

Here, too, the efficacy of Nicaragua's procedure for return of or compensation for seized property, as well as Nicaragua's ability to meet United States standards of due process are unproven. An evidentiary hearing in which Nicaragua can demonstrate that its procedures warrant recognition is indicated. Accordingly, summary judgment on the conflicting claims of Jose Somoza and COIP cannot be granted at this time.

## OTHER ADVERSE CLAIMS

Pursuant to Judge Owen's Order of June 22, 1987, this court provided notice of the interpleaded fund to INCA shareholders by mail and publication. The majority of claims based on INCA stock ownership are uncontested; however, the following conflicts require resolution:

*Dr. Emilio Bandes Wagui*

■ Salvador Bandes died sometime after he fled Nicaragua and his son Jorge Bandes was named executor of his estate. Jorge claims that Salvador's brother and partner, Dr. Emilio Bandes Wagui, sold Salvador 5,000 shares of INCA preferred and 5,000 shares of INCA common in late 1977 or early 1978. As Salvador's executor, Jorge has the stock certificates representing these shares, endorsed by Dr. Bandes Wagui when he sold them. Though Dr. Bandes Wagui admits that the sale occurred, he contends that he was never paid for the stock, and he now seeks that portion of the fund corresponding to the shares he sold to his brother. Jorge, however, has the stock certificates, endorsed by Dr. Bandes Wagui, in his possession.

■ Possession of a certificated security, endorsed, is persuasive evidence of ownership and a sufficient basis for summary judgment in favor of the possessor. *Lapidus v. Hiltzik,* 160 A.D.2d 682, 553 N.Y.S.2d 458, 459–60 (2d Dept.1990) ("when signatures on a certificated security are admitted or established, production of such security entitles a holder to recover on it unless the plaintiff establishes a ... defect going to the validity of the security"); *see also Kaufman v. Diversified Industries, Inc.,* 460 F.2d 1331, 1334 (2d Cir.1972), *cert. denied,* 409 U.S. 1038, 93 S.Ct. 517, 34 L.Ed.2d 487 (1972); *Matthysse v. Securities Processing Services, Inc.,* 444 F.Supp. 1009, 1017 (S.D.N.Y.1977).

In response to Dr. Bandes's contention of non-payment, Jorge submits documents purportedly showing regular payments from Salvador to his brother. This is a claim for another day and perhaps another forum. Delivery of the endorsed shares to Salvador Bandes divested Dr. Bandes Wagui of interest in them. *See Lapidus,* 553 N.Y.S.2d at

460 ("delivery of the certificate . . . effected a relinquishment of [claimant's] interest and he could not assert that his delivery of the certificate was meaningless"). Accordingly, Dr. Bandes's claim to the portion of the fund corresponding to the 10,000 shares in question should be denied.

*Rosa Bandes de Bandes*

 Rosa Bandes de Bandes acquired 4,450 shares of INCA preferred in 1971 pursuant to a subscription agreement. At some point she acquired an additional 1,386 INCA shares, probably from her father Salomon prior to his death. Although the certificates representing the latter are still in Rosa's possession, they are not designated "Serie B" as are other preferred shares submitted to the court. Still, Rosa contends that these shares are preferred.

Jorge has the stock certificates, endorsed by Rosa Bandes de Bandes, representing the 4,450 shares she purchased in 1971. She claims, however, that she never took possession of the stock certificates following her purchase and that she never sold her stock to Salvador. She doesn't explain how her signature came to be on the back of the stock certificates and she now seeks a portion of the interpleaded fund corresponding to 4,450 shares of INCA preferred stock simultaneously claimed by her nephew Jorge in his capacity as executor of his father Salvador's will.

Rosa also says that she owns, as evidenced by the certificates apparently in her possession, an additional 1,386 shares of INCA preferred and seeks that portion of the interpleaded fund. Lastly, both Jorge and Rosa claim a block of 295 common shares, the certificates of which are missing.

Jorge responds that Rosa sold her block of 4,450 shares to her brother Salvador to achieve greater liquidity in anticipation of the hardships of an ensuing Sandinista victory. Again, he supports his claim powerfully by pointing to the actual certificates of ownership, endorsed by Rosa, in his possession. *Lapidus,* 553 N.Y.S.2d at 459–60; *see also Kaufman,* 460 F.2d at 1334; *Matthysse,* 444 F.Supp. at 1017. Because he possess the endorsed stock certificates, Jorge is entitled to the portion of the fund corresponding to the disputed block of 4,450 shares.

 A different question is raised by the 1,386 shares in Rosa's possession, evidently owned at one time by her father Salomon. She claims that these shares are preferred shares although she submits no evidence supporting this contention.

Jorge argues that because these shares do not appear on the surviving INCA shareholder's list, dating back to the late seventies, they were likely cancelled. In addition, he argues these shares could not be preferred shares for three reasons. First, Salomon does not mention this block in is his will. Second, the certificates themselves lack the "Serie B" designation. Lastly, oblique reference to 1,386 common, not preferred, shares of stock owned by Salomon is found in the minutes of an INCA shareholder's meeting. Beyond her assertion that these shares are preferred, Rosa Bandes de Bandes offers no evidence that this is so. Accordingly, Rosa fails to submit adequate proof from which a jury could conclude that the shares in question were preferred; indeed, she offers no evidence to controvert the plain inference to be drawn from the absence of a "Serie B" designation on the shares. *See Southern California Federal Savings & Loan Association v. Fugazy Express, Inc.,* No. 85 Civ. 2723 (S.D.N.Y.1988) (1988 WL 5347); *cf. Horn & Hardart Co. v. Pillsbury Co.,* 888 F.2d 8, 11 (2d Cir.1989) (summary judgment appropriate when no reasonable trier of fact could accept non-movant's construction of written documents at issue). For these reasons, I conclude that the 1,386 shares Rosa holds are common ones.

 Lastly, both Rosa and Jorge claim entitlement to a block of 295 shares of common stock. Although neither has the stock certificates evidencing ownership, Jorge apparently does not dispute that the last surviving INCA shareholder's list mentions a block of 295 common shares owned by Rosa. Affidavit of Jorge Bandes ¶ 5. He asserts that Rosa sold this block to Jorge's father sometime after the compilation of this last shareholder's list. *See* Affidavit of Jorge Bandes ¶¶ 5, 7. Rosa disputes the sale, and she and Jorge have submitted contradictory

affidavits. Because Jorge submits no evidence to substantiate Rosa's sale, beyond his contested affidavit, it appears that Rosa is entitled to the block of 295 common shares in that the last documented list of shareholder's indicates that she owned the shares.

### General Ulises Carillo's claim

 Around the same time that Salvador Bandes sold 25,028 INCA shares to Jose Somoza, he also sold 500 shares to General Ulises Carillo of the Nicaraguan Army. COIP now claims entitlement to that portion of the interpleader fund corresponding to Ulises Carillo's 500 shares, relying on Decree No. 3, see supra at 3, under which Carillo's interest in INCA was confiscated.

In Carillo's favor, Nicaragua does not allege that he extorted or otherwise illegally obtained his stock from Bandes nor that he had recourse to or was even aware of any Nicaraguan remedial procedure to contest the confiscation of his property. Moreover, Nicaragua makes no attempt to mitigate its confiscation of Carillo's shares by pointing to a default judgment pursuant to Decrees 11–90 and 23–91 as it had with respect to Somoza or alleging that Carillo had recourse to a due process procedure to contest the seizure. Accordingly, "such a taking is shocking to our sense of justice," and not recognized. Bandes, 852 F.2d at 667 (cites omitted). Carillo is entitled to that portion of the interpleaded fund corresponding to his 500 INCA shares.

### Conclusion

For the reasons stated, I recommend that summary judgment not be granted at this time pending an evidentiary hearing to determine whether the Nicaraguan procedure to evaluate claims to property confiscated during the Sandinista regime adequately comports with United States concepts of due process.

With respect to the adverse claims to various blocks of INCA stock, I recommend that Ulises Carillo's claim prevail over that of COIP, and that Jorge Bandes's claim prevail over that of Dr. Emilio Bandes Wagui. Further, I recommend that Rosa Bandes de Bandes's block of 1,386 shares of INCA stock

be considered common shares. Lastly, Jorge should take the 4,450 shares of preferred stock that he and Rosa simultaneously claim, but Rosa appears to have the better claim to the disputed block of 295 shares of common stock.

Copies of this report have been mailed this date to the parties listed below, who are hereby advised of their right to file objections to this report with Judge Owen on or before March 26, 1993. See 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e). Failure to object to this report by that date will preclude appellate review. Small v. Secretary of HHS, 892 F.2d 15, 16 (2d Cir.1989).

Dated: March 9, 1993.